[No. A098920. First Dist., Div. Five. Aug. 30, 2006.]

AILANTO PROPERTIES, INC., Plaintiff and Appellant, v.
CITY OF HALF MOON BAY et al. Defendants and Appellants.

## COUNSEL

Aaronson, Dickerson, Cohn & Lanzone, Robert J. Lanzone; Cassidy, Shimko & Dawson, Stephen K. Cassidy, Anna C. Shimko, Matthew D. Francois; McCracken, Byers & Haesloop and Michael D. McCracken for Plaintiff and Appellant.

Adam U. Lindgren, City Attorney; Meyers, Nave, Riback, Silver & Wilson, Julia L. Bond, Armit S. Kulkarni; Jarvis, Fay & Deporto and Rick W. Jarvis for Defendants and Appellants.

## OPINION

**SIMONS, Acting P. J.**—Under the Subdivision Map Act (Gov. Code, § 66410 et seq.),[1] the life of a vesting tentative map does not include "any period of

---

[1] All further undesignated section references are to the Government Code.

time during which a development moratorium, imposed after approval of the tentative map, is in existence. However, the length of the moratorium shall not exceed five years." (§ 66452.6, subd. (b)(1).) Ailanto Properties, Inc. (Ailanto), a developer, challenges a decision of the superior court holding that under section 66452.6, subdivision (b)(1) the expiration of Ailanto's vesting tentative map was tolled for only five years, though a series of development moratoria imposed by respondents City of Half Moon Bay and City Council of the City of Half Moon Bay (collectively, City) far exceeded this time period. The City, in turn, appeals from the superior court's ruling that Ailanto's delivery of a purported phased final map to the city engineer constituted an effective filing entitling Ailanto to a 36-month extension of its vesting tentative map under section 66452.6, subdivision (a)(1), despite the fact that the phased final map admittedly did not conform to the requirements of the vesting tentative map and was not in a form that could be approved by the City.

We hold that section 66452.6, subdivision (b)(1) limits to five years the length of any moratorium-related tolling of the expiration of a tentative map. We further hold that Ailanto's filing of a phased final map with the city engineer does not entitle Ailanto to a further extension of the life of its vesting tentative map because the phased final map does not conform to the requirements of the vesting tentative map. We therefore affirm in part and reverse in part.

FACTUAL AND PROCEDURAL BACKGROUND[2]

The property at issue in this litigation is a 114-acre parcel located in the City. Ailanto acquired the property in 1985 and proceeded with plans to develop the property for residential use.

In 1987, the City accepted as complete Ailanto's application for a vesting tentative map for subdivision of the property into 228 lots for single family residences and for a corresponding planned unit development zoning ordinance. The following year, the City prepared an environmental impact report (EIR) on the proposed 228-lot development project pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). The EIR found that all potential significant environmental impacts of the project would be mitigated to a level of less than significant by the imposition of mitigation measures. The planning commission unanimously recommended certification of the EIR in 1989 and recommended approval of the Dykstra Ranch Planned Unit Development Ordinance as the zoning ordinance for the

---

[2] The essential facts of this case are not in dispute. In its trial brief, the City stipulated to a number of the facts in Ailanto's complaint. Our statement of the facts is drawn largely from that stipulation.

property.[3] Around this time, Ailanto redesigned its proposed project to reduce the number of units from 228 to 216 in response to certain environmental mitigation measures set forth in the EIR.

### The Vesting Tentative Map and Its Conditions

The city council approved the vesting tentative map for 216 units and certified the EIR on August 7, 1990. On August 21, 1990, the city council approved the Dykstra Ranch Planned Unit Development Ordinance, which sets forth the development standards and conditions for the property. The vesting tentative map imposed a number of conditions that Ailanto had to fulfill before a final map could be approved and recorded. One of these conditions was that Ailanto obtain "any permits required by the [California] Coastal Commission . . . or other agency with permitting jurisdiction over the subject property . . . prior to approval of a Final Map." Other conditions required that Ailanto obtain approval of water and sewer connections from the relevant agencies and officials.

### The Water and Sewer Moratoria

At the time the city council approved the vesting tentative map, the area in question was subject to a water service moratorium that the Coastside County Water District (District) had imposed by ordinance in 1976. The District imposed the moratorium because the water supply was inadequate to serve the increased demand brought on by additional building. The moratorium was not for a set period of time. Rather, the ordinance by which it was imposed provided that it would expire when the water system supply was expanded to meet additional demand. The District ultimately lifted the moratorium in March 1994, when the District completed the Crystal Springs Water Supply Project.

When the vesting tentative map was approved, it required that a coastal development permit be obtained from the California Coastal Commission (Commission) before the property could be developed. In early 1991, Ailanto sought a coastal development permit from the Commission, but the Commission returned Ailanto's application on April 5, 1991, because the property lacked sufficient water rights.

On March 28, 1991, the City adopted an urgency ordinance finding that the capacity of the City's existing sewer treatment plant was inadequate to serve any new development for which a building permit had not been issued,

---

[3] "Dykstra Ranch" is the former name for the subdivision which is now called "Pacific Ridge."

regardless of whether a vesting tentative map had been approved for the development. The ordinance prohibited future allocation of sewer connections until the sewage treatment plant was expanded. The Pacific Ridge subdivision was subject to the sewer moratorium, and as long as the moratorium remained in effect, Ailanto was precluded from obtaining necessary approvals from the Commission or the City, including a coastal development permit, a final subdivision map, or building permits. For the next eight years, the city council acted periodically to extend the sewer moratorium, and it did not expire until March 31, 1999.

## Coastal Development Permit Proceedings

On February 5, 1998, in anticipation of completion of an extension of the City's sewer plant, Ailanto filed an application with the City for a coastal development permit.[4] After the planning commission voted to deny the application, Ailanto appealed to the city council, which formed a subcommittee to negotiate with Ailanto regarding the project. As a result of the negotiations, the number of lots in the Pacific Ridge subdivision was reduced from 216 to 197. On March 16, 1999, the city council overturned the planning commission's denial of Ailanto's application and approved the coastal development permit for Pacific Ridge. The City issued a notice of final action with respect to the coastal development permit on March 23, 1999.

On April 6, 1999, certain individuals appealed to the Commission the City's issuance of the coastal development permit to Ailanto. In simplest terms, the appeals contended that development of the project was inconsistent with the local coastal plan. On March 17, 2000, the Commission made a "substantial issue" finding in the appeals, meaning that it would hear the appeals de novo pursuant to Public Resources Code sections 30603 and 30621. The Commission ultimately denied the appeals on February 16, 2001, and it approved the coastal development permit for Pacific Ridge subject to a number of special conditions. Ailanto has challenged the legality of these conditions in a separate action against the Commission.

## Delivery of the Phase 1 Final Map to the City Engineer

Ailanto delivered a purported phased final map to the city engineer on May 10, 2001, and supplemented that submission on May 11 and August 6, 2001.

---

[4] While the sewer moratorium was in effect, the authority to issue coastal development permits had shifted from the Commission to the City after the Commission's certification of the City's local coastal program in April 1996. (See *City of Half Moon Bay v. Superior Court* (2003) 106 Cal.App.4th 795, 798, fn. 4 [131 Cal.Rptr.2d 213].)

The city engineer returned the phased final map because he could not make the finding that the phased final map substantially conformed to the vesting tentative map. The city engineer specifically noted that the City was prohibited from approving any final map for a project that lacked a coastal development permit, and because the Pacific Ridge development had not obtained such a permit, the City did not have legal authority to approve the phase 1 final map.

### Ailanto's Action and the Expiration of the Vesting Tentative Map

On April 17, 2001, Ailanto filed the action below, seeking declaratory relief pursuant to Code of Civil Procedure section 1060. In its first cause of action, Ailanto sought a declaration that the sewer moratorium extended the life of the vesting tentative map for the entire eight-year life of the moratorium from March 28, 1991, to March 31, 1999. In its second cause of action, Ailanto sought a declaration that a separate "development moratorium" existed during the time the City and the Commission processed Ailanto's application for a coastal development permit and that this development moratorium tolled expiration of the vesting tentative map. Ailanto's third cause of action requested a declaration as to whether the filing of a final map occurs upon delivery of the final map to the city engineer or upon the meeting of the city council at which the City receives the map.[5]

### Voter Initiatives Limiting Development Within the City of Half Moon Bay

Since Ailanto's vesting tentative map was approved, the City of Half Moon Bay voters have enacted two growth control measures that significantly limit residential development within the city. In May 1991, the voters adopted Measure A, an initiative that limited growth to a 3 percent increase in population per year. The provisions of Measure A were incorporated into chapter 17.06 of the city municipal code, which establishes a "Residential Dwelling Unit Building Permit Allocation System."

In November 1999, the voters adopted another growth control initiative entitled Measure D, which limits growth in the City of Half Moon Bay to a 1 percent increase in population per year. In accordance with Measure D, the city council amended chapter 18.04 of the city municipal code in June 2001. The validity of Measure D is currently the subject of litigation, and the

---

[5] Ailanto's complaint also pled a fourth cause of action for recovery of amounts Ailanto paid to finance public improvements. This cause of action was bifurcated and subsequently dismissed and is not at issue in this appeal.

measure has not yet taken effect because the Commission has not yet approved its addition to the city's local coastal program.

If Ailanto's vesting tentative map expires, its property would be subject to the conditions imposed by both Measure A and Measure D.[6]

### The Trial Court's Decision

After a bench trial, the trial court denied Ailanto's requested relief on its first and second causes of action, but granted the requested relief on the third cause of action. Addressing Ailanto's first cause of action, the trial court stated that resolution of the issue turned on the interpretation of section 66452.6, subdivision (b)(1). The trial court found the language of the statute ambiguous, and relying on its legislative history, the court held that "the legislative history shows an intent to place a [five]-year cap on the amount of time the life of a [vesting tentative map] can be extended on account of development moratorum."

The trial court also rejected Ailanto's argument that the Fourth District's opinion in *Native Sun/Lyon Communities v. City of Escondido* (1993) 15 Cal.App.4th 892 [19 Cal.Rptr.2d 344] (*Native Sun*) demonstrated that the life of a tentative map could be extended by multiple development moratoria. The court held that *Native Sun* was distinguishable, because in that case the developer and the city had agreed to waive the expiration of the developer's map, and the court found that such an agreement was lacking in Ailanto's case.

Having concluded that section 66452.6, subdivision (b)(1) imposed a five-year cap on moratorium-related extensions of the life of tentative maps, the trial court necessarily rejected Ailanto's claim that it had been subjected to multiple moratoria that tolled expiration of its tentative map. The trial court therefore denied Ailanto's request for relief on the second cause of action.

Turning to Ailanto's third cause of action, the trial court held that Ailanto's delivery of a phased final map to the city engineer was an effective filing that triggered a 36-month extension of the vesting tentative map pursuant to

---

[6] In real terms, Measure A's 3 percent growth limit would permit only 103 new dwelling units per year. Under the City's allocation system, only 34 units would be available for new development projects. At most, Ailanto could be allocated only one-half of the available units, limiting it to 17 building permits per year. If Measure D becomes effective, the number of building permits available to Ailanto would obviously be lower.

section 66452.6, subdivisions (a)(1) and (d).[7] The trial court rejected the City's argument that the delivery to the city engineer was ineffective because the phased final map was not in substantial conformance with the vesting tentative map and thus could not be approved by the City. The trial court stated that it was "unable to find any statute or case law that supports [the City's] position that in order to constitute a filing that will trigger the [three]-year extension of [section 66452.6, subdivision (a)], the documents delivered to the city engineer must be 'approvable.' " The trial court therefore concluded that Ailanto's delivery of the phased final map to the city engineer extended the life of Ailanto's map by three years.

The trial court entered judgment in accordance with its statement of decision on May 13, 2002. Ailanto filed a notice of appeal on May 22, 2002.[8]

### DISCUSSION

Ailanto appeals from the trial court's ruling on its first and second causes of action. The City appeals from the trial court's decision granting relief to Ailanto on its third cause of action. At the heart of these appeals are questions of interpretation of the Subdivision Map Act, and, in particular, section 66452.6. We will address the issues raised in Ailanto's appeal before turning to the City's appeal.

### I. *Ailanto's Appeal.*

Ailanto challenges the trial court's ruling that Ailanto's vesting tentative map was tolled for only five years pursuant to section 66452.6, subdivision (b)(1). Ailanto argues first that section 66452.6, subdivision (b)(1) limits

---

[7] Section 66452.6, subdivision (a)(1) provides that "each filing of a final map authorized by Section 66456.1 shall extend the expiration of the approved or conditionally approved tentative map by 36 months from the date of its expiration, as provided in this section, or the date of the previously filed final map, whichever is later."

Section 66452.6, subdivision (d) provides: "The expiration of the approved or conditionally approved tentative map shall terminate all proceedings and no final map or parcel map of all or any portion of the real property included within the tentative map shall be filed with the legislative body without first processing a new tentative map. Once a timely filing is made, subsequent actions of the local agency, including, but not limited to, processing, approving, and recording, may lawfully occur after the date of expiration of the tentative map. *Delivery to the county surveyor or city engineer shall be deemed a timely filing for purposes of this section.*" (Italics added.)

[8] Resolution of this appeal has been delayed for two reasons. First, there were a number of extensions of the briefing schedule because of delays in preparation of the reporter's transcript and at the request of the parties. Second, on December 29, 2003, the parties moved to stay the case because settlement appeared to be imminent. This court granted that motion on January 7, 2004, and ordered the parties to submit status reports every 60 days. Status reports were filed between March 2004 and May 2005. On May 5, 2005, this court lifted the stay and ordered that briefing be completed. The case was not fully briefed until October 20, 2005.

to five years the length of time that a development moratorium may be imposed, not the length of any moratorium-related tolling of the expiration of a vesting tentative map. Second, Ailanto claims that even if the five-year limit in section 66452.6, subdivision (b)(1) applies to the length of the moratorium-related tolling, *Native Sun* establishes that the five-year limit applies separately to each development moratorium that delays approval of the final subdivision map and that there were multiple moratoria to which Ailanto's project was subject. Third, Ailanto contends that the City should be equitably estopped from asserting any five-year limitation in this case. We will address each of these arguments in turn.

### A. *Standard of Review.*

Ailanto's appeal requires us to resolve the parties' conflicting constructions of section 66452.6. "Interpretation of section 66452.6 presents a question of law that we review de novo. [Citation.]" (*Bodega Bay Concerned Citizens v. County of Sonoma* (2005) 125 Cal.App.4th 1061, 1069 [23 Cal.Rptr.3d 327].) De novo review is likewise appropriate in this case because "the parties have stipulated to the relevant facts and the issues before us are questions of statutory interpretation. [Citation.]" (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082 [36 Cal.Rptr.3d 650].)

### B. *The Process of Statutory Interpretation.*

■ "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) As Division Two of this court recently explained, the process of determining legislative intent is one that may involve up to three steps. (*MacIsaac v. Waste Management Collection & Recycling, Inc., supra,* 134 Cal.App.4th at p. 1082.) In the first step, we "examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend." (*Coalition,* at p. 737.)

When the plain language of the statute does not resolve the interpretive question, we proceed to the second step of our inquiry. At this stage, we "may turn to rules or maxims of construction 'which serve as aids in the sense that they express familiar insights about conventional language usage.' " (*Mejia v.*

*Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166], quoting 2A Singer, Statutes and Statutory Construction (6th ed. 2000) p. 107.) In addition, "[i]f the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles, supra,* 34 Cal.4th at p. 737.)

If the meaning of the statute remains unclear after examination of both the statute's plain language and its legislative history, then we proceed cautiously to the third and final step of the interpretive process. (*MacIsaac v. Waste Management Collection & Recycling, Inc., supra,* 134 Cal.App.4th at p. 1084.) At this final stage of the process, we apply "reason, practicality, and common sense to the language at hand." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1239 [8 Cal.Rptr.2d 298].) The words of the statute should be interpreted "to make them workable and reasonable." (*Ibid.*) We will also consider the consequences that will flow from a particular statutory interpretation. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) "In determining what the Legislature intended we are bound to consider not only the words used, but also other matters, 'such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction. [Citation.]' [Citation.]" (*American Tobacco Co. v. Superior Court* (1989) 208 Cal.App.3d 480, 486 [255 Cal.Rptr. 280].)

### C. *The Plain Language of the Statute Does Not Resolve the Interpretive Question.*

We begin our inquiry, as we must, with the language of the statute itself. The parties' disagreement focuses on the meaning of section 66452.6, subdivision (b)(1). That provision states: "The period of time specified in subdivision (a) [setting the life of tentative maps], including any extension thereof granted pursuant to subdivision (e), shall not include any period of time during which a development moratorium, imposed after approval of the tentative map, is in existence. *However, the length of the moratorium shall not exceed five years.*" (§ 66452.6, subd. (b)(1), italics added.) Ailanto argues that "the express statutory language limits to [five] years the length of any single moratorium, but in no way limits the length of tolling the life of a map when more than one moratorium [is] in place for a total period exceeding [five] years." The City argues, and the trial court agreed, that this subdivision provides for a five-year limit on the length of the period during which the expiration of a tentative subdivision map may be tolled as a result of development moratoria.

Ailanto adopts the position that the statute is unambiguous and that its plain meaning must prevail. Ailanto focuses on the final sentence of subdivision (b)(1), and contends that this sentence means simply that no development moratorium may exceed five years in duration. Ailanto notes that if the Legislature had intended to limit the length of the tolling period, it could simply have said, "However, the length of the *extension* shall not exceed five years."[9] (See § 66452.6, subd. (a)(1) ["*extensions* shall not extend the tentative map more than 10 years from its approval or conditional approval," italics added].)

The City responds that reading the statute to place a five-year limit on all development moratoria would create irreconcilable conflicts with other statutory provisions that authorize development moratoria for different periods of time. (See Gov. Code, § 65858 [two-year limit on interim planning and zoning moratoria]; Wat. Code, § 355 [water moratorium remains in effect until such time as water supply "has been replenished or augmented"].) In addition, the City argues that Ailanto's reading would lead to the absurd result that a moratorium would cease after five years, "regardless of whether the threat to public health and safety which triggered the moratorium is still in effect." Thus, the City contends, in the case of a water or sewer moratorium, a local government would have to allow development to proceed after five years, even if local water or sewer capacity were inadequate to support the development.

We must interpret section 66452.6 in the context of the entire statute of which it is a part. (*City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1015 [20 Cal.Rptr.2d 658].) Viewing this section in light of the entire statutory scheme, we seriously doubt that the Legislature intended the final sentence of section 66452.6, subdivision (b)(1) to place a limit on the length of development moratoria. The article of which section 66452.6 is a part is concerned with procedures relating to tentative maps, and all of the sections in this article set out procedures applicable to tentative maps. (See § 66452 et seq.) Nothing in the article suggests that it is intended to regulate the imposition of development moratoria by local governments. Indeed, the Fourth District has held that "the legislative purpose expressed in . . . section 66452.6 [is] *to establish a maximum life for an approved or conditionally approved tentative map*." (*Native Sun, supra,* 15 Cal.App.4th at

---

[9] Ailanto's position on the effect of this statutory language has not always been consistent. In July 1999, counsel for Ailanto wrote to the city attorney and set forth Ailanto's views on the life of its tentative map. In her letter, Ailanto's counsel stated that "due to the sewer moratorium, which was enacted on March 28, 1991, the map was extended for *five years* under [section 66452.6, subdivision (b)], which provides for the tolling of the life of [a] tentative map during a development moratorium for a maximum of five years."

p. 912, italics added.) Ailanto's reading is inconsistent with the statutory scheme, which is concerned with establishing procedures applicable to tentative maps.[10]

Although our analysis of the statutory scheme indicates that section 66452.6, subdivision (b)(1) limits the length of moratorium-related tolling and not the length of development moratoria, we do not believe that Ailanto's interpretation of the statute is wholly unreasonable. Standing alone, the final sentence of section 66452.6, subdivision (b)(1) would seem to limit the length of a development moratorium to five years. But, as we have explained, reading the sentence in the context of the larger statutory scheme points us to a different conclusion.[11] Thus, the statutory language "is susceptible to more than one reasonable interpretation;" it is ambiguous. (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324].) Because the language of the statute alone does not resolve the interpretive question, we must turn to the second step of our inquiry and look to the statute's legislative history to clarify its meaning. (*Halbert's Lumber, Inc. v. Lucky Stores, Inc., supra,* 6 Cal.App.4th at p. 1239.)

---

[10] Nor are we persuaded by Ailanto's contention that the Legislature's use of the term "extension" in other subdivisions of section 66452.6 indicates that it intended the final sentence of subdivision (b)(1) to operate as a limit on the length of development moratoria. In those instances, the word "extension" refers to the Legislature's previous use of the verb "extend" in the same subdivision. (See § 66452.6, subd. (a)(1) ["[E]ach filing of a final map authorized by Section 66456.1 shall extend the expiration of the approved or conditionally approved tentative map by 36 months . . . . The extensions shall not extend the tentative map more than 10 years from its approval or conditional approval."]; § 66452.6, subd. (e) ["Upon application of the subdivider . . . , the time at which the map expires pursuant to subdivision (a) may be extended by the legislative body or by an advisory agency . . . for a period or periods not exceeding a total of five years. The period of extension specified in this subdivision shall be in addition to the period of time provided by subdivision (a)."].) By contrast, subdivision (b)(1) provides that the running of the life of the map shall not include periods of time during which a development moratorium is in existence. It is thus more accurate to describe the effect of subdivision (b)(1) as *tolling* the expiration of the tentative map, rather than extending its life. (See *Native Sun, supra,* 15 Cal.App.4th at p. 914 ["we conclude a moratorium applies to the original approved tentative map until 120 days following the completion of the [subarea facilities plan] condition, but not for a *tolling period* exceeding [five] years," italics added].)

[11] Brief statements in two prominent treatises on California land use law support the City's position, although they contain little discussion or reasoning. (See 2 Longtin, Longtin's Cal. Land Use (2006 supp.) § 6.21[11], p. 72 ["the period of validity [of a tentative map] . . . is extended for the period of a development moratorium *up to an additional five years*," italics added]; 4 Manaster & Selmi, Cal. Environmental Law and Land Use Practice (2006) § 61.04[8][d], p. 61-56 ["[t]entative tract maps are tolled during the term of a development moratorium *for a period not exceeding five years*," italics added].)

D. *The Legislative History Demonstrates That the Five-year Limitation Applies to the Length of the Moratorium-related Tolling.*

In the second step of our interpretive inquiry, we examine the entire history of the Legislature's enactment and amendment of the statute. (E.g., *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1150–1153 [278 Cal.Rptr. 614, 805 P.2d 873].) As we shall explain, the current wording of the final sentence of section 66452.6, subdivision (b)(1) dates from 1986. An examination of the original text of the statute and the evolution of the language of this provision is nevertheless useful in ascertaining its current meaning.

1. *The Enactment of Section 66452.6.*

Section 66452.6 was enacted in 1974. The original version of the statute provided that a tentative map would expire 12 months after its approval or up to 30 months after approval if extended by local ordinance. (Stats. 1974, ch. 1536, § 4, p. 3464.) In 1977, the Legislature added the following language to subdivision (a) of the statute: "The period of time herein specified shall not include any period of time during which a water or sewer moratorium, imposed after approval of the tentative map, is in existence, *provided however, that the length of such moratorium does not exceed five years.*" (Stats. 1977, ch. 883, § 1, p. 2652, italics added.) We find the italicized language unambiguous, and it makes clear that the 1977 version of the statute limited the length of the *moratorium-related tolling* to five years. The 1977 amendment thus extended the expiration of a tentative map while a water or sewer moratorium was in place, but only up to a maximum of five years.

The Legislature amended section 66452.6 again in 1979, moving the language concerning moratorium-related tolling from subdivision (a) to subdivision (b), where it remains today. (Stats. 1979, ch. 297, § 1, p. 1108.) In 1981, the Legislature broadened the provision for moratorium-related tolling so that it would apply to any "development moratorium," rather than just water or sewer moratoria. (Stats. 1981, ch. 482, § 1, p. 1826.) The term "development moratorium" was defined in subdivision (f) as "a water or sewer moratorium or a water and sewer moratorium, as well as other actions of public agencies which regulate land use, development, or the provision of services to the land, other than the public agency with the authority to approve or conditionally approve the tentative map, which thereafter prevents, prohibits, or delays the approval of a final or parcel map." (Stats. 1981, ch. 482, § 1, p. 1826.) The legislative history of the 1981 amendment discusses the background of the statute, and it reflects the Legislature's understanding that the statute placed a limit on the length of time that the

expiration of a tentative map could be tolled due to a moratorium. (Assem. Com. on Local Gov., Analysis of Assem. Bill No. 612 (1981–1982 Reg. Sess.) as amended May 4, 1981, p. 1 ["Whenever a sewer or water moratorium is imposed subsequent to the approval of a tentative map, the length of the moratorium (*provided such moratorium does not exceed five years*) is not counted against the 'initial life' of the tentative map (i.e., 12–30 months)," italics added]; Sen. Com. on Local Gov., Analysis of Assem. Bill No. 612 (1981–1982 Reg. Sess.) as amended May 14, 1981, p. 1 [same].)

### 2. *The 1986 Amendment.*

The key amendment for purposes of this appeal came in 1986, when the Legislature again revised the wording of section 66452.6. (Stats. 1986, ch. 789, § 2, p. 2668.) The legislation, Assembly Bill No. 2740 (1985–1986 Reg. Sess.), enacted as chapter 789, changed the wording of section 66452.6, subdivision (b), as follows: "The period of time specified in subdivision (a) shall not include any period of time during which a development moratorium, imposed after approval of the tentative map, is in existence, provided however, that. *However,* the length of the moratorium does *shall* not exceed five years." (Sen. Amend. to Assem. Bill No. 2740 (1985–1986 Reg. Sess.) May 7, 1986, italics and strikeout in original.) Chapter 789 thus revised subdivision (b) to include the language that is now the final sentence of subdivision (b)(1).

As explained above, the statute as it existed between 1977 and 1986 tolled the expiration of a tentative map during the period of a water or sewer moratorium "provided however, that the length of *such moratorium* does not exceed five years." We think it is evident that the *earlier* version of the statute placed a maximum limit on the time that the expiration of a tentative map could be tolled because of a moratorium. Thus, to accept Ailanto's argument, we would be required to conclude that the Legislature intended that the 1986 amendment effect a change in the prior meaning of the statute, but an examination of the legislative history of chapter 789 suggests it did not.

Ailanto places principal reliance on two legislative caucus analyses of Assembly Bill No. 2740. Although the analyses focus primarily on other matters in the bill, they do state in passing that the bill would also "limit the length of a development moratorium to not exceed five years." (Assem. Republican Caucus, analysis of Assem. Bill No. 2740 (1985–1986 Reg. Sess.) July 2, 1986, p. 1; Assem. Republican Caucus, analysis of Assem. Bill No. 2740 (1985–1986 Reg. Sess.) Aug. 19, 1986, p. 1.) This brief mention in two legislative caucus analyses does not alter our conclusion, however. It is true that some California courts have considered analyses by legislative party

caucuses as part of a statute's legislative history, at least where such analyses are *consistent* with other legislative history. (*People v. Ledesma* (1997) 16 Cal.4th 90, 98 [65 Cal.Rptr.2d 610, 939 P.2d 1310]; but see *Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1425 [96 Cal.Rptr.2d 314] ["a court will generally consider only those materials indicative of the intent of the Legislature *as a whole*"].) Here, we think that the complete absence of anything in the Legislative Counsel's Digest, committee reports, and other legislative history materials speaks far more loudly than a single phrase in these two caucus analyses.

In stark contrast to the caucus analyses, the other available items of legislative history are utterly silent on the moratorium issue. For example, according to the Legislative Counsel's Digest, the primary purposes of chapter 789 were (1) to eliminate the requirement for an official seal of a notary public on final map acknowledgements, (2) to revise various filing dates prescribed for the delivery of documents, (3) to restrict the ability of local agencies to condition subdivision approvals on a subdivider's agreement to indemnify the local agency, and (4) to clarify that no reimbursement would be made from the State Mandates Claims Fund for costs mandated by the state pursuant to the Subdivision Map Act. (Legis. Counsel's Dig., Assem. Bill No. 2740, 4 Stats. 1986 (1985–1986 Reg. Sess.) Summary Dig., p. 261.) It is reasonable to presume that the Legislature amended this provision with the intent expressed in the Legislative Counsel's Digest. (*People v. Superior Court (Douglass)* (1979) 24 Cal.3d 428, 434 [155 Cal.Rptr. 704, 595 P.2d 139].) That the Legislative Counsel made no mention of an intent to limit the length of development moratoria to five years suggests that this was not the intent of chapter 789. (See *Harris v. Capital Growth Investors XIV, supra,* 52 Cal.3d at p. 1158, fn. 6; *Douglass,* at p. 434.)

In addition, a third reading analysis prepared for the Senate Rules Committee explains how the bill changes the law regarding the need for notary seals and requiring applicants for development to indemnify local governments as a condition of approval of a development project. The analysis then goes on to state that "[i]n addition, the bill revises various filing dates for delivery of documents." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill. No. 2740 (1985–1986 Reg. Sess.) as amended May 29, 1986, pp. 1–2.) It says nothing at all about imposing a limit on the duration of development moratoria. The same is true of an analysis prepared by the Senate Housing and Urban Affairs Committee. (Sen. Housing and Urban Affairs Com., Analysis of Assem. Bill No. 2740 (1985–1986 Reg. Sess.) as amended May 7, 1986, p. 1 [explaining notary seal and indemnity issues and stating that bill "revises various filing dates for delivery of documents"].) A comprehensive report that discusses in detail the provisions of Assembly Bill No. 2740, as well as both the Conference Committee and Senate Floor amendments, likewise makes no mention of limiting the length

of development moratoria.[12] (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Assem. Bill No. 2740 (1985–1986 Reg. Sess.) Aug. 25, 1986, pp. 1–2.)

We note also that floor statements in both the Senate and the Assembly characterized Assembly Bill No. 2740 as "noncontroversial legislation." It is difficult to imagine that legislation that would have significantly curbed the power of local governments by imposing an absolute limit on the length of development moratoria could properly be characterized as "noncontroversial." And we think it highly unlikely that the Legislature would make such a significant change in the power of local governments to control development without so much as a passing reference to what it was doing. The Legislature "does not, one might say, hide elephants in mouseholes." (*Whitman v. American Trucking Assns., Inc.* (2001) 531 U.S. 457, 468 [149 L.Ed.2d 1, 121 S.Ct. 903].) We conclude that the legislative history of chapter 789 shows no intent by the Legislature to alter the prior meaning of the statute.

### 3. *Subsequent Legislative History.*

Our view is reinforced by the legislative history of later amendments to section 66452.6.[13] In 1988, the Legislature made certain changes to the definition of "development moratorium" that are either no longer in effect or not relevant to the issues before us. (See Stats. 1988, ch. 1330, § 2, p. 4398.) The legislative history of chapter 1330 plainly reflects the Legislature's understanding that section 66452.6, subdivision (b)(1) limited the length of time during which the expiration of a tentative map could be tolled, not the length of a development moratorium. Most telling is the Legislative Counsel's Digest of the act, which explains that "[u]nder existing law, a tentative

---

[12] The same is true of a Concurrence in Senate Amendments presented to the Assembly for its consideration, a Conference Committee report on the bill, and a Conference Report Analysis. (Assem. Com. on Local Gov., conc. in Sen. Amend. to Assem. Bill No. 2740 (1985–1986 Reg. Sess.) as amended May 29, 1986; Conf. Com., Rep. on Assem. Bill No. 2740 (1985–1986 Reg. Sess.) Aug. 25, 1986; Conf. Rep. Analysis of Assem. Bill No. 2740 (1985–1986 Reg. Sess.) as amended Aug. 21, 1986.) In all of their discussion of this legislation, none of these documents even hint at an intent to set a time limit on the length of development moratoria.

[13] We may properly rely on the legislative history of subsequent enactments to clarify the Legislature's intent regarding an earlier enacted statute. "Although a legislative expression of the intent of an earlier act is not binding upon the courts in their construction of the prior act, that expression may properly be considered together with other factors in arriving at the true legislative intent existing when the prior act was passed. [Citations.]" (*Eu v. Chacon* (1976) 16 Cal.3d 465, 470 [128 Cal.Rptr. 1, 546 P.2d 289].) While the concept of "subsequent legislative history" may seem oxymoronic, it is well established that "the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 [62 Cal.Rptr.2d 243, 933 P.2d 507].)

map, unless extended, expires 24 months after approval or conditional approval. However, the *expiration date* is extended for the period of any development moratorium, as defined, *up to [five] additional years.*" (Legis. Counsel's Dig., Sen. Bill No. 186 (1987–1988 Reg. Sess.) 4 Stats. 1988, Summary Dig., pp. 450–451, italics added.) The Legislative Counsel's understanding is confirmed in the committee analyses and reports on the bill. A report prepared for the Assembly Committee on Local Government, explaining the time limits on the life of a tentative map, states that "[a]ny moratoriums *(up to five years)* must be added to these limits . . . ." (Assem. Com. on Local Gov., Rep. on Sen. Bill No. 186 (1987–1988 Reg. Sess.) Aug. 1, 1988, p. 6, italics added; see also *ibid.* [referring to the "[five]-year moratorium extension"]; Assem. Com. on Local Gov., 3d reading analysis (1987–1988 Reg. Sess.) Aug. 11, 1988, p. 3 ["any development moratoriums as defined (up to five years) must be added to these limits"].)

The Legislature further amended subdivisions (b) and (f) of section 66452.6 in 1991. (Stats. 1991, ch. 907, § 2, p. 4015.) The legislative history of chapter 907 continues to reflect the Legislature's understanding that the five-year limitation applied to the length of the moratorium-related tolling and not to the length of a development moratorium. Analyses and reports on the legislation from the Assembly Committee on Local Government, the Senate Committee on Housing and Urban Affairs, and the Senate Rules Committee all reinforce the view that the Legislature viewed the five-year limitation as applying to the length of the moratorium-related tolling period, and not to the length of the moratorium itself. (See Assem. Com. on Local Gov., Analysis of Assem. Bill No. 1905 (1991–1992 Reg. Sess.) as introduced Mar. 8, 1991, p. 2 [under the Subdivision Map Act "[a]*n extension of up to five years* is allowed for a 'development moratorium,' " italics added]; Sen. Housing and Urban Affairs Com., Rep. on Assem. Bill No. 1905 (1991–1992 Reg. Sess.) July 11, 1991, p. 3 ["the development moratorium provisions which allow for up to [five] years *on a tentative map extension,*" italics added]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1905 (1991–1992 Reg. Sess.) as amended Aug. 19, 1991, p. 3 [same].)

■ In summary, the legislative history of section 66452.6 points us to the conclusion that the five-year limit in subdivision (b)(1) was intended by the Legislature to apply to the length of the moratorium-related tolling of the expiration of a tentative map and not to the duration of the development moratorium itself. We therefore agree with the City and the trial court that the legislative history of the statute demonstrates that subdivision (b)(1) does not place a limit on the duration of development moratoria.

E. *"Reason, Practicality, and Common Sense" Confirm That Section 66452.6 Limits the Length of the Moratorium-related Tolling, Not the Length of Development Moratoria.*

■ Although our review of the legislative history suffices to support our conclusion, applying "reason, practicality, and common sense to the language at hand" confirms that conclusion. (*Halbert's Lumber, Inc. v. Lucky Stores, Inc., supra,* 6 Cal.App.4th at p. 1239.) In this third step of the interpretive inquiry, we consider the consequences that will flow from a particular interpretation. (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.) As one prominent jurist has suggested, "[t]he judge should try to think his way as best he can into the minds of the enacting legislators and imagine how they would have wanted the statute applied to the case at bar." (Posner, *Statutory Interpretation—in the Classroom and in the Courtroom* (1983) 50 U.Chi. L.Rev. 800, 817.)

As the City points out, Ailanto's reading would negate other statutory provisions that permit the imposition of moratoria for periods exceeding five years. For example, the Water Code authorizes the governing body of a distributor of a public water supply to deny applications for new or additional water service connections in the event of a water shortage emergency condition. (See Wat. Code, §§ 350, 353, 356; see generally *Building Industry Assn. v. Marin Mun. Water Dist.* (1991) 235 Cal.App.3d 1641, 1646–1647 [1 Cal.Rptr.2d 625].) If such a water moratorium is imposed, Water Code section 355 provides that the moratorium "shall thereafter be and remain in full force and effect during the period of the emergency and until the supply of water available for distribution within such area has been replenished or augmented." The Water Code thus permits a water moratorium to continue until the water supply has been replenished or augmented; it places no other limit on the length of the moratorium. If we were to agree with Ailanto's construction of Government Code section 66452.6, subdivision (b)(1), however, the statute would effectively terminate a water moratorium after five years, regardless of whether there was sufficient water supply in the area concerned. In short, under Ailanto's reading, section 66452.6, subdivision (b) would simply negate Water Code section 355. We cannot adopt such a reading, because we must interpret Government Code section 66452.6 in the context of the entire statutory system of which it is a part, and that system includes statutory provisions located in separate codes. (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1695 [8 Cal.Rptr.2d 614].) And it is a fundamental rule of statutory construction that a court will not adopt a construction that renders another provision of law ineffective or superfluous. (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 459 [279 Cal.Rptr. 834, 807 P.2d 1063].)

As should be obvious, Ailanto's interpretation would lead to absurd practical results. If it were adopted, then development moratoria would expire after five years without any regard for the conditions that led to their imposition. Thus, localities that lacked sufficient water or sewer capacity to accommodate new development would be able to prevent development for up to five years but would be powerless to stop it thereafter, whether or not water or sewer capacity was adequate. We are simply unwilling to impute such an intent to the Legislature. (See *MacIsaac v. Waste Management Collection & Recycling, Inc., supra,* 134 Cal.App.4th at pp. 1091–1092 & fn. 12 [court will not adopt an interpretation that would lead to capricious and unintended results].)

F. *Multiple Moratoria and* Native Sun.

Ailanto argues that it was subjected to multiple development moratoria, each of which operated to toll the expiration of its vesting tentative map. It contends that even if section 66452.6, subdivision (b)(1) places a five-year limit on the length of a moratorium-related tolling of the expiration of a tentative map, the statute in no way limits the *number* of moratoria that may effect such a tolling. Thus, according to Ailanto, multiple moratoria may lead to multiple tolling periods. Ailanto seeks support for this contention from *Native Sun.*

We reject Ailanto's argument for two reasons. First, Ailanto's view has no basis in the statutory language. As we have held in the previous part of this opinion, the statute places a five-year limit on the length of the moratorium-related tolling of the expiration of a tentative map. There is nothing in the language of the statute to indicate that the Legislature intended to permit *multiple* tolling periods. Indeed, the language of the statute suggests otherwise. If the Legislature had intended to permit the life of tentative maps to be tolled indefinitely by multiple development moratoria, it could simply have omitted the final sentence of section 66452.6, subdivision (b)(1) and ordained that the life of a tentative map would not include "*any* period of time" during which a development moratorium is in existence. There would be no need for the Legislature to state that "the length of the moratorium shall not exceed five years" unless it sought to place an outer limit on tolling the expiration of the tentative map.

Second, the case before us is distinguishable from *Native Sun. Native Sun* involved a suit by a developer against the City of Escondido arising out of the city's decision to deny approval of a proposed development project. (*Native Sun, supra,* 15 Cal.App.4th at p. 896.) In that case, the city approved a tentative map on December 7, 1983, and later approved a three-year extension of the life of the map, extending its validity until December 8,

1989. (*Id.* at p. 899.) The city and the developer then engaged in negotiations over the project, and at the developer's request, the city adopted a "friendly moratorium" before the tentative map expired to toll expiration of the map. (*Id.* at pp. 897, 901–902.) The friendly moratorium was adopted on November 1, 1989, and was to last until either April 18, 1991, or until the developer obtained approval of the final map. (*Id.* at p. 902.) On November 28, 1990, the city adopted a growth management ordinance that prevented development in reliance on prior approvals. (*Id.* at pp. 911, 912.) The city denied the developer's proposed modifications to the previously approved tentative map on May 1, 1991, and the developer challenged that denial in court. (*Id.* at p. 904.)

The issue as framed by the *Native Sun* court was whether the city's decision to deny approval of the proposed project resulted in a statutory development moratorium under section 66452.6, subdivision (f)(1) because of the city's imposition of a condition that the city complete a subarea facilities plan prior to approval of the developer's project. (*Native Sun, supra,* 15 Cal.App.4th at p. 897.) The Court of Appeal held that the city's actions did constitute a development moratorium under section 66452.6, subdivision (f)(1). (*Native Sun,* at p. 912.) The court concluded that because the tentative map was still "alive" by virtue of the friendly moratorium when the statutory moratorium took effect, the statutory moratorium served to extend the life of the tentative map. (*Id.* at pp. 913–914.) The Court of Appeal held that "a moratorium applies to the original approved tentative map until 120 days following the completion of the [subarea facilities plan] condition, but not for a tolling period exceeding [five] years from November 28, 1990." (*Id.* at p. 914.)

Ailanto contends that the *Native Sun* court held that multiple moratoria can extend the life of a tentative map by more than five years. But this issue was not addressed (or even mentioned) by the *Native Sun* court. Moreover, the five-year limitation of section 66452.6, subdivision (b)(1) would not have been a decisive factor in *Native Sun* in any case, because whether the five-year period began to run on November 1, 1989 (the date of the "friendly moratorium") or on November 28, 1990 (the date of the growth management ordinance), the developer's map would still have been "alive" in May 1993 when the *Native Sun* opinion was issued.

We also agree with the trial court that this case is factually distinguishable from *Native Sun.* We are not faced with a situation in which the City and Ailanto agreed to waive the time limits on the life of the tentative map, as the parties did in *Native Sun.* (See *Native Sun, supra,* 15 Cal.App.4th at p. 912 [referring to "an agreed upon friendly moratorium"].) Ailanto relies on the testimony of Christopher Gustin, the former building and planning director

for the City, that the City's standard practice was to toll the time limits on development permits until an applicant had secured a coastal development permit. Ailanto argues that this practice created a friendly moratorium. We disagree for two reasons. First, Gustin's testimony casts significant doubt regarding the existence and effect of this supposedly standard practice. He testified that he was unaware of any subdivision map that had actually been extended as a result of the practice. Gustin also admitted that there was no documentation of any such tolling, and he was also unable to identify any municipal code section or city ordinance that authorized it. Moreover, we agree with the trial court that the testimony does not establish an "agreement" between the City and Ailanto to waive the expiration of the vesting tentative map, like the one in *Native Sun*.

In summary, we find *Native Sun* both legally and factually distinguishable from this case. We therefore reject Ailanto's argument that *Native Sun* compels a ruling in its favor.

### G. *Ailanto Has Waived Its Equitable Estoppel Argument, and the Argument Would Fail on Its Merits.*

Ailanto also argues that equitable considerations, such as estoppel, preclude the City from asserting any five-year limitation on the moratorium-related tolling period. However, save for a passing reference in the later-dismissed fourth cause of action, there is no mention of equitable estoppel in Ailanto's complaint. The equitable estoppel theory was not asserted in either Ailanto's principal trial brief or in the two supplemental trial briefs it filed. As discussed in the previous part, Ailanto sought to bring itself under the *Native Sun* case. Ailanto argued, first, that the "City's practice" of tolling the expiration of a vested tentative map while a coastal development permit application was pending was the equivalent of the friendly moratorium in *Native Sun*. Ailanto then argued that its good faith performance, including the expenditure of millions of dollars, exceeded the developers' performance in *Native Sun*. At no point prior to the court's tentative decision did Ailanto ever argue that its performance or any "city practice" created an estoppel. In fact, it first used the term "estoppel" in its objection to the court's tentative ruling, refusing to apply *Native Sun* to the facts of this case. In this objection, Ailanto argued a different form of estoppel than the one sought in its briefing in this court. It argued below that the City was estopped from claiming the life of the vesting tentative map ran "while the [coastal development permit] was being processed." In our court, it argues for a somewhat broader estoppel: Ailanto's expenditures estop the "City from asserting any [five-year] limitation" on moratorium-related tolling. Ailanto's failure to raise this matter below prevents us from addressing it now. (See *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847 [60 Cal.Rptr.2d 780].)

■   Moreover, on the merits, we would reject Ailanto's separate estoppel claims made here and below. Ailanto argued below that the City's practice of tolling the time limit on vesting tentative maps until a coastal development permit was obtained creates an estoppel. This contention rests on the assumption that the City had the power to waive indefinitely the limitations imposed by state law on the life of vesting tentative maps. Ailanto never provides any legal support for this assumption, and there is none. This court has held that a city may not agree to forgo application of *its own* zoning and building code requirements to permit development that would otherwise be prohibited by those requirements. (*Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 55 [275 Cal.Rptr. 17]; see *Burchett v. City of Newport Beach* (1995) 33 Cal.App.4th 1472, 1480 [40 Cal.Rptr.2d 1].) If a local government cannot agree to forgo application of its own land use policies, it surely cannot choose to forgo application of land use policies imposed by the Legislature.

Section 66452.6, subdivision (a)(1) precludes the alternative estoppel argument raised by Ailanto on appeal. Ailanto relies upon the millions of dollars it has spent on financing public improvements to argue that City is estopped from asserting the five-year cap contained in section 66452.6, subdivision (b)(1).

In 1985, the Legislature recognized that, following the issuance of the vesting tentative map, a developer might spend significant sums on public improvements and that such expenditures justified an extension of the map's life. It then expressly provided for that eventuality: "[I]f the subdivider is subject to a requirement of [$100,000][14] or more to construct or improve or finance the construction or improvement of public improvements outside the boundaries of the tentative map, each filing of a final map authorized by Section 66456.1 shall extend the expiration of the approved or conditionally approved tentative map by 36 months from the date of its expiration . . . ." (Stats. 1985, ch. 852, § 1.5, p. 2727 [former § 66452.6, subd. (a)].)[15]

This express extension reflects a legislative judgment regarding the appropriate balance between the interests of developers whose expenses for public

---

[14] The expenditure level that triggers an extension of the expiration date has changed over time. Currently section 66452.6, subdivision (a)(1) provides: "[I]f the subdivider is required to expend [$178,000] or more to construct, improve, or finance the construction or improvements of public improvements outside the property boundaries of the tentative map . . . , each filing of a final map authorized by [s]ection 66456.1 shall extend the expiration of the approved or conditionally approved tentative map by 36 months from the date of its expiration . . . ." (Stats. 2004, ch. 118, § 22.)

[15] Further, section 66452.6, subdivision (a)(1) provides that the life of the map may be extended by any local ordinance, for a period not to exceed an additional 12 months. In section 17.22.050.B. of its Subdivision Ordinance, the City provided for a 12-month extension when a developer has spent more than $125,000 for public improvements outside the boundaries of the vesting tentative map that are reasonably related to the proposed development.

improvements may continue while they are subject to moratorium-related delays and the interests of cities and counties in being permitted to reconsider planning decisions after a set period of time. Accepting Alianto's estoppel argument would substitute our own judgment for the Legislature's and replace the current objective test with a highly subjective "equitable" standard. This we will not do.

## II.  *The City's Appeal.*

The City appeals from the trial court's ruling on Ailanto's third cause of action. In that cause of action, Ailanto sought a declaration that the filing of its phase 1 final map with the city engineer constituted "an effective filing of such map for purposes of the Subdivision Map Act." Ailanto acknowledged that its phase 1 final map lacked a coastal development permit (a requirement attached to the vesting tentative map) and thus was not in a form that could be approved by the City. Nevertheless, Ailanto claimed that the delivery of the map to the city engineer extended the life of the vesting tentative map by 36 months in accordance with section 66452.6, subdivision (a)(1).[16] In Ailanto's view, its delivery of the map to the city engineer was a timely filing under section 66452.6, subdivision (d). As a result, Ailanto contends, the filing alone operated to extend the life of its vesting tentative map for another three years. The City, on other hand, contends that "neither subdivision (d) nor subdivision (a)(1) [of section 66452.6] should be construed to extend the life of a tentative map where a developer submits a proposed first phase final map in a form which the City cannot approve."

The trial court agreed with Ailanto. In its ruling, it stated that it could find no statute or case law to support the City's contention that "in order to constitute a filing that will trigger the [three]-year extension of [section 66452.6, subdivision (a)], the documents delivered to the city engineer must be 'approvable.' " The trial court reasoned that under section 66452.6, subdivision (d), "the date of filing with the city engineer, not the date of the city council meeting at which the map might be considered, is the event that

---

[16] Section 66452.6, subdivision (a)(1) provides in relevant part: "An approved or conditionally approved tentative map shall expire 24 months after its approval or conditional approval, or after any additional period of time as may be prescribed by local ordinance, not to exceed an additional 12 months. However, if the subdivider is required to expend one hundred seventy-eight thousand dollars ($178,000) or more to construct, improve, or finance the construction or improvement of public improvements outside the property boundaries of the tentative map, excluding improvements of public rights-of-way which abut the boundary of the property to be subdivided and which are reasonably related to the development of that property, each filing of a final map authorized by Section 66456.1 shall extend the expiration of the approved or conditionally approved tentative map by 36 months from the date of its expiration, as provided in this section, or the date of the previously filed final map, whichever is later. . . ." The parties do not dispute that Ailanto's expenditures for public improvements exceed the statutory threshold.

triggers the extension of the [vesting tentative map]." The trial court concluded that because Ailanto had completed delivery by August 6, 2001, and its map was still "alive" on that date, the life of the vesting tentative map was extended by three years.

The question before us is therefore whether the delivery to the city engineer of a final map that admittedly does not conform to the requirements of the vesting tentative map extends the life of the tentative map under section 66452.6, subdivisions (a)(1) and (d). We conclude that it does not.

### A. *The Statute Is Unambiguous.*

The parties disagree about whether the relevant statutory language is ambiguous and therefore about whether we may look to legislative history to resolve the interpretive question. (See *MacIsaac v. Waste Management Collection & Recycling, Inc., supra,* 134 Cal.App.4th at pp. 1083–1084 [when plain meaning of statute's text does not resolve interpretive question, court may look to extrinsic aids, including legislative history].) Ailanto argues that the final sentence of section 66452.6, subdivision (d) is unambiguous and that its plain language establishes that the delivery of a final map to the city engineer extends the life of the tentative map by 36 months. (See § 66452.6, subd. (d) ["Delivery to the county surveyor or city engineer shall be deemed a timely filing for purposes of this section."].) In Ailanto's view, the statutory language is clear, and reliance on legislative history is improper. The City contends that the parties' differing interpretations of section 66452.6, subdivision (d) "demonstrate sufficient ambiguity to justify resort to the legislative history."

■ We agree with Ailanto that, viewed in context, the statute is unambiguous. Contrary to the City's contention, the mere fact that the parties disagree about the meaning of the provision in question does not indicate that it is ambiguous. "[S]tatutory ambiguity cannot be determined by referring to the parties' interpretations of the statute. Of course their interpretations differ. That is why they are in court." (*John v. U.S.* (9th Cir. 2001) 247 F.3d 1032, 1041 (en banc); see also *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265] [ambiguity not demonstrated by disagreement concerning meaning of phrase or by fact that phrase isolated from its context is susceptible of more than one meaning].) We conclude, however, that the unambiguous language of the statute compels a ruling in the City's favor on Ailanto's third cause of action.

### B. *Delivery of an Admittedly Nonconforming Phased Final Map to the City Engineer Does Not Extend the Life of the Tentative Map.*

■ Under section 66452.6, subdivision (a)(1), the life of an "approved or conditionally approved tentative map" is extended by 36 months upon the

filing of "a final map authorized by Section 66456.1." Section 66456.1 is part of article 4 of the Subdivision Map Act, which governs final maps. (See § 66456 et seq.) Section 66456.1 permits the filing of multiple final maps relating to an approved or conditionally approved tentative map. As the City correctly points out, however, the first section of article 4 provides that after the approval or conditional approval of a tentative map, a subdivider may have a final map prepared "*in accordance with* the approved or conditionally approved tentative map." (§ 66456, italics added.)

In this case, it is undisputed that Ailanto's phase 1 final map did not conform to the vesting tentative map in that, at the time of delivery to the city engineer, Ailanto had not fulfilled the condition that it obtain a coastal development permit. This is a significant deficiency, because a coastal development permit was explicitly required both by the terms of the California Coastal Act of 1976 and the conditions attached to the vesting tentative map. (See Pub. Resources Code, §§ 30600, subd. (a) ["any person . . . wishing to perform or undertake any development in the coastal zone . . . shall obtain a coastal development permit"], 30106 [defining "development" as "change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act"].)

The City argues that the purpose of the language in section 66452.6, subdivision (d) regarding delivery to the county surveyor or city engineer "is to allow the City to act on a timely-filed final map after expiration of the tentative map, . . . [t]he language does not excuse *substantive* compliance with the Subdivision Map Act and, accordingly, does not extend the life of tentative maps where these substantive requirements are not met." For its part, Ailanto contends that the final sentence of section 66452.6, subdivision (d) means what it says, and that therefore its delivery of the phase 1 final map to the city engineer must be deemed a timely filing for purposes of section 66452.6. Accordingly, Ailanto asserts that the trial court correctly held that its delivery of the map to the city engineer extended the life of Ailanto's vesting tentative map by another 36 months.

We note at the outset that although Ailanto purports to rely on the "plain meaning" of the final sentence of section 66452.6, subdivision (d), its argument actually deviates significantly from the language used by the Legislature. As explained above, Ailanto's third cause of action sought a declaration that the filing of its phase 1 final map with the city engineer constituted "an *effective* filing of such map for purposes of the Subdivision Map Act." By contrast, the language of section 66452.6, subdivision (d) states only that delivery to the city engineer "shall be deemed a *timely* filing for purposes of this section." (§ 66452.6, subd. (d), italics added.) Ailanto's reading of the statute conflates two distinct concepts. That is, the *timely*

*delivery* of a purported final map to the city engineer is not the same thing as an *effective filing* for purposes of the Subdivision Map Act. The plain language of subdivision (d) speaks exclusively to timeliness.

Furthermore, we must interpret the language of section 66452.6, subdivision (d) in the context of the entire statute of which it is a part. (*City of Lafayette v. East Bay Mun. Utility Dist., supra,* 16 Cal.App.4th at p. 1015.) Such a contextual interpretation strengthens the City's position, for the City's view finds support in other provisions of the Subdivision Map Act. For example, section 66457, subdivision (a) would seem to foreclose Ailanto's argument that a "final map" may be "filed" if that map does not conform to the requirements of the tentative map. Under that section, a final map *"conforming to the approved or conditionally approved tentative map . . .* may be *filed* with the legislative body for approval after all required certificates or statements on the map have been signed and, where necessary, acknowledged." (§ 66457, subd. (a), italics added; see also 63 Ops.Cal.Atty.Gen. 844, 845 (1980) ["Once a tentative map has been approved or conditionally approved, *any* final map caused to be *filed* by the subdivider *must be prepared in accordance with such approved or conditionally approved tentative map.* (§ 66456.)" (Italics added.)] Thus, a map that does not conform to the approved or conditionally approved tentative map may not be filed for approval by the legislative body.

Ailanto seeks to distinguish its "filing" of the map with the city engineer from "approval" of the map by the city council. It claims that it "will have obtained a [coastal development permit] prior to seeking approval of its final map." Ailanto's argument misconceives the statutory scheme for the approval of final maps, for it assumes that the City could accept delivery of the phase 1 final map and then withhold action until such time as Ailanto succeeds in obtaining the required coastal development permit. But the Subdivision Map Act makes quite clear that once the City receives Ailanto's map, it must either approve it or disapprove it. (See § 66458, subd. (a).) And it must do so quickly. If the final map "conforms to all the requirements" of the Subdivision Map Act and to any local ordinances applicable at time of the approval or conditional approval of the tentative map, the legislative body must approve the map "at the meeting at which it receives the map or, at its next regular meeting after the meeting at which it receives the map." (§ 66458, subd. (a).) Contrary to Ailanto's apparent assumption, the statutory timetable leaves no room for the City simply to suspend action on a nonconforming map in the hope that the subdivider will fulfill the requirements of the vesting tentative map at some unknown future date.[17]

---

[17] The requirement that the City act promptly after filing of the final map is easily understood when one recalls that the City's action at this stage of the process is ministerial rather than discretionary. (*Youngblood v. Board of Supervisors* (1978) 22 Cal.3d 644, 656 [150

## C. *Case Law Supports the City's Position.*

In *McPherson v. City of Manhattan Beach* (2000) 78 Cal.App.4th 1252 [93 Cal.Rptr.2d 725], the court rejected an argument strikingly similar to the one Ailanto makes here.[18] In that case, the developer contended that the filing of a vesting final parcel map with the city engineer had preserved its rights under the tentative map, even though the developer had failed to pay certain taxes and to submit monument inspection data, each of which was a prerequisite to recording of the map. (*Id.* at pp. 1257, 1263.) The court held that "the delivery of the final map to the city engineer did not constitute a timely filing for purposes of preserving vesting rights under the approved vesting tentative map." (*Id.* at p. 1263.) According to the *McPherson* court, "this interpretation is the only one which makes any sense and preserves the purpose of the statute. To hold otherwise would permit a developer to secure tentative vesting rights in perpetuity, simply by submitting the map to the city engineer while cleverly, or inadvertently, withholding payment of the requisite taxes." (*Ibid.*)

■ In this case, as in *McPherson,* if we were to accept Ailanto's argument, it could secure extensions of its vesting tentative rights simply by filing documents that purported to be phased final maps with the city engineer, even if the documents failed to comply with the conditions of the vesting tentative map.[19] We will not adopt an interpretation of the statute that would lead to such a result. (See *MacIsaac v. Waste Management Collection &*

---

Cal.Rptr. 242, 586 P.2d 556].) That is, if the map conforms to all applicable requirements, the City *must* approve it. (See § 66458, subd. (a) ["The legislative body *shall* . . . approve the map if it conforms to all the requirements of this chapter and any local . . . ordinance applicable at the time of approval or conditional approval of the tentative map . . . ," italics added]; *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1199 [52 Cal.Rptr.2d 518] ["a final map may not be disapproved if it is in substantial compliance with a previously approved tentative map"].) Similarly, "[i]f the map does not conform, the legislative body *shall* disapprove the map." (§ 66458, subd. (a), italics added; *Soderling v. City of Santa Monica* (1983) 142 Cal.App.3d 501, 509 [191 Cal.Rptr. 140].) The City's approval of the final map "in effect is a confirmation that the tentative map requirements have been fulfilled." (*Kriebel v. City Council* (1980) 112 Cal.App.3d 693, 703 [169 Cal.Rptr. 342].)

[18] In *McPherson,* the court construed the language of section 66463.5, subdivision (b). (*McPherson v. City of Manhattan Beach, supra,* 78 Cal.App.4th at p. 1263.) That section relates to the filing of parcel maps, and its language is identical in all relevant respects to that of section 66452.6, subdivision (d). (*Friends of Westhaven & Trinidad v. County of Humboldt* (2003) 107 Cal.App.4th 878, 881–882 [132 Cal.Rptr.2d 561] [§§ 66463.5 and 66452.6 "have similar language and legislative history" so that "the same analysis would obtain under either provision"].)

[19] Ailanto attempts to distinguish *McPherson* by claiming that the court in that case reached its result by construing a local ordinance that required the recording of a final map within three years of its approval. But the *McPherson* court was quite clear that the developer's vested rights also expired under the express provisions of the Subdivision Map Act and, therefore, the developer's vested rights would have expired even without applying the local ordinance. (See *McPherson v. City of Manhattan Beach, supra,* 78 Cal.App.4th at pp. 1260–1262.) This court's

*Recycling, Inc., supra,* 134 Cal.App.4th at p. 1083 [court will not adopt interpretation of statute based on "plain meaning" if such interpretation would frustrate the manifest purposes of the legislation].)

### D. *Ailanto's Equitable Arguments Are Unpersuasive.*

Ailanto argues that the City's position that a coastal development permit is a prerequisite to the filing of a final map ignores the fact that Ailanto can only obtain the permit "once it creates and dedicates the park parcel depicted on the phase 1 final map." This argument plainly misstates the record, for all that Ailanto is required to do with regard to the park parcel is to "execute and record a document . . . *offering to dedicate* in fee the to City . . . the 1.9-acre park site . . . ." There is no requirement that the dedication be accepted or that the park actually be created before the Commission will issue the coastal development permit. Thus, it would seem that fulfilling this condition is within Ailanto's control. Ailanto's claim that this condition somehow places it in a "Catch-22" is simply without merit. (See *McPherson v. City of Manhattan Beach, supra,* 78 Cal.App.4th at p. 1264, fn. 5 [where actions necessary to meet requirements of tentative map are within control of developer, such requirements "must be satisfied before delivery to the city engineer can be deemed a timely filing, preserving the developer's rights after the tentative expires"].)

Ailanto also claims that the City has taken inconsistent positions regarding the effect of filing a final map and that the City therefore "should be barred from making such inconsistent claims and representations to the court regarding the effect of filing of a final map." Ailanto seizes upon language in a July 29, 1999 letter from the city attorney to Ailanto's counsel in which the city attorney states, "I agree that upon filing of the first final map, the map will be eligible for a three year extension." This letter does not assist Ailanto. In the letter, the city attorney notes that "no final map has yet been filed for this project." Because no final map had been filed at the time the letter was written, the city attorney could not have been opining on the issue raised by the City's appeal—whether the delivery of an admittedly nonconforming phased final map to the city engineer constitutes a filing that would entitle Ailanto to a 36-month extension of the life of its tentative map.

---

opinion in *Bodega Bay* likewise furnishes no support to Ailanto. In that case, the issue was whether under section 66452.6, subdivision (d) a county board could act upon a developer's timely filed application for an extension of a tentative map one month after the map's expiration date. (*Bodega Bay Concerned Citizens v. County of Sonoma, supra,* 125 Cal.App.4th at p. 1069.)

■■■■■■■■■■■■■■■

DISPOSITION

The trial court's judgment with respect to Ailanto's first and second causes of action is affirmed. Its judgment with respect to Ailanto's third cause of action is reversed.

Defendants City of Half Moon Bay and City Council of the City of Half Moon Bay are awarded costs on appeal.

Gemello, J., and Reardon, J.,* concurred.

On September 18, 2006, the opinion was modified to read as printed above.

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.