Filed 11/4/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE-LOS ANGELES et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ALEX PADILLA, as Secretary of State, etc., <br><br> Defendant and Respondent. | A155392 <br><br> (San Francisco City & County Super. Ct. No. CPF-18-516155) |

## I. INTRODUCTION

Plaintiffs and appellants Asian Americans Advancing Justice—Los Angeles, Asian Americans Advancing Justice—Asian Law Caucus, and the American Civil Liberties Union of Northern California (collectively plaintiffs) appeal from a judgment denying their petition for writ of mandate. Plaintiffs claim defendant and respondent Alex Padilla, the California Secretary of State, has misinterpreted, and thus failed to properly enforce, Elections Code section 14201, which requires the posting and availability of facsimile ballot materials printed in languages other than English at certain polling places.[1]

We conclude the Secretary has properly assessed the need for language assistance on a precinct, rather than county-wide, basis and has also acted within his discretion in looking to the Voting Rights Act of 1965 (52 U.S.C. § 10101 et seq.) to inform his interpretation of "single language minority," terminology used in both section 14201 and

---

[1] All further statutory references are to the Elections Code unless otherwise indicated.

1

the Voting Rights Act, but as to which definitional assistance and regulatory guidance is provided only in connection with the federal Act.  We further conclude, however, that in tying his language assistance determinations to the list of jurisdictions determined by the Director of the Census and Attorney General to be subject to the requirements of the Voting Rights Act, the Secretary has erroneously imported into state law the federal Act's higher percentage threshold of voting age citizens who are members of a single language minority group (five percent, rather than three percent as specified by state law).  We therefore affirm in part and reverse in part.

## II. BACKGROUND

### A. *Overview of Federal and California Voting Rights Statutes*

Before turning to the particulars of plaintiffs' claims, we provide a rudimentary overview of the relevant provisions of the Voting Rights Act and section 14201.

### 1. *Federal Voting Rights Act*

"The Voting Rights Act of 1965 reflects Congress' firm intention to rid the country of racial discrimination in voting.  The heart of the Act is a complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant." (*South Carolina v. Katzenbach* (1996) 383 U.S. 301, 315, fn. omitted.)

"The remedial provisions of the Act [citation] were extended by the Voting Rights Act Amendments of 1970, 1975, 1982, and 2006. . . .  The Voting Rights Act Amendments of 1975 extended the protections of the Act to 'language minorities.' " (7 Witkin, Summary of Cal. Law (11th Ed. 2017) § 257, p. 413; Sen. Com. on Judiciary, Voting Rights Act Extension, Rep. No. 94-295, p. 24.)  Congress recognized that "many Americans rely heavily on languages other than English, and that they require information in minority languages in order to be informed voters and participate effectively in our representative democracy."  (The United States Department of Justice, *Language Minority Citizens* (Feb. 26, 2018) <https:www.justice.gov/crt/language-minority-citizens> [as of Nov. 4, 2019].)  Thus, as enacted in 1975 and amended "in 1982 and 2006, Section 203(b) of the *Voting Rights Act of 1965* requires that a State or political subdivision in certain circumstances must provide language assistance during

2

elections for groups of citizens who are unable to speak or understand English well enough to participate in the electoral process." (Slud et al., Statistical Methodology (2016) for Voting Rights Action, Section 203 Determinations (Dec. 13, 2018), p. iii, U.S. Census Bureau, Center for Statistical Research & Methodology, Research Reports and Studies, Research Report Series-Statistics (Research Rep. Series) <https://www.census.gov/srd/papers/pdf/RRS2018-12.pdf> [as of Nov. 4, 2019]; 28 C.F.R. §§ 55.2(a) & (b), 55.4.[2])

The Voting Rights Act expressly defines "language minorities" and/or "language minority group[s]" as persons who are of Asian American, American Indian, Alaskan Natives, or Spanish heritage. (52 U.S.C. § 10503(e); 28 C.F.R. § 55.1.) "Congress selected these language minority groups because of substantial evidence that many of these groups suffered from voting discrimination or other forms of discrimination that limited their ability to participate in the political process, suffered from severe language barriers, and had depressed voter registration and turnout." (Tucker, *Enfranchising Language Minority Citizens: The Bilingual Election Provisions of the Voting Rights Act* (2006) 10 N.Y.U. J. Legis. & Pub. Pol. 195, 209, citing Sen. Com. on Judiciary, Voting Rights Act Extension, Rep. No. 94-295, pp. 30–31.) In contrast, "[n]o evidence was received concerning the voting difficulties of other language groups. Indeed, the voter registration statistics for the 1972 Presidential election showed a high degree of participation by other language groups: German, 79 percent; Italian, 77.5 percent; French, 72.7 percent; Polish, 79.8 percent; and Russian, 85.7 percent." (Sen. Com. on Judiciary, Voting Rights Act Extension, Rep. No. 94-295, p. 31.)

To secure the voting rights of the defined "language minorities" or "language minority group[s]," Congress implemented "Bilingual election requirements" applicable

---

[2] Regulations implementing the provisions of the Voting Rights Act regarding "language minorities" and "language minority group[s]" are set forth in Title 28, Part 55 of the Code of Federal Regulations (28 C.F.R. § 55.1 et seq.).

to jurisdictions that are subject to the remedial provisions of the federal law. (52 U.S.C. § 10503; 28 C.F.R. § 55.3.)

As relevant to this case, a State or political subdivision,[3] must provide language assistance under the Voting Rights Act if, according to data from the most recent census, "(i)(I) more than 5 percent of the citizens of voting age of such State or political subdivision are members of a *single language minority* and are limited-English proficient;[4] [¶] (II) more than 10,000 of the citizens of voting age of such political subdivision are members of a *single language minority* and are limited-English proficient; or [¶] (III) in the case of a political subdivision that contains all or any part of an Indian reservation, more than 5 percent of the American Indian or Alaska Native citizens of voting age within the Indian reservation are members of a *single language minority* and are limited-English proficient; and [¶] (ii) the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate." (52 U.S.C. § 10503(b)(2)(A)(i)(I)–(III), (ii), italics added; 28 C.F.R. §§ 55.4(a)(2), (b), 55.6(a).)

Thus, "[d]eterminations of coverage under section 203(c) [of the Voting Rights Act] are made with regard to specific language groups of the language minorities listed in section 203(e) [of the Act]." (28 C.F.R. § 55.6(c).)

---

[3] A political subdivision is "usually a county," but can be "a township or municipality in some states." (The United States Department of Justice, *Language Minority Citizens* (Feb. 26, 2018) <https:www.justice.gov/crt/language-minority-citizens> [as of Nov. 4, 2019]; 28 C.F.R. § 55.1.)

[4] The "term 'limited-English proficient' means unable to speak or understand English adequately enough to participate in the electoral process." (52 U.S.C. § 10503(b)(3)(B); 28 C.F.R. § 55.6(b).) The Census Bureau determines the number of limited-English proficient speakers using questions from the census. The first question asks, " 'Does this person speak a language other than English at home?' " and if so, what language. The second question asks, " 'How well does this person speak English?' " The potential responses are: " 'Very well,' " " 'Well,' " " 'Not well,' " and " 'Not at all.' " "The consistent and longstanding practice of the Census Bureau has been to treat a response with any answer other than 'Very well' as indicating limited English proficiency."

As for the terminology "single language minority," the implementing regulations supplement the statutory definitional language (52 U.S.C. § 10503(b)(2)(A)(i)(I)–(III), (e)) by providing assistance in identifying "[l]anguage minority groups" and such groups that "have more than one language." (28 C.F.R. §§ 55.11, 55.12.) The regulations explain, in part: "Some language minority groups, for example, Filipino Americans, have more than one language other than English. A jurisdiction required to provide election materials in the language of such a group need not provide materials in more than one language other than English. The Attorney General will consider whether the language that is used for election materials is the one most widely used by the jurisdiction's voting-age citizens who are members of the language minority group." (28 C.F.R. § 55.12(a).)

Determinations of coverage under the Voting Rights Act are made by the Director of the Census and the Attorney General. (28 C.F.R. § 55.4(a).) These determinations are "not reviewable in any court," and the bilingual requirements of the Act become operative on publication of the determinations in the Federal Register. (*Ibid.*) Once published, the coverage determinations are also reprinted as an appendix to the regulations. (28 C.F.R. 55 Appendix, "APPENDIX TO PART 55—JURISDICTIONS COVERED UNDER SECTIONS 4(f)(4) AND 203(c) OF THE VOTING RIGHTS ACT OF 1965, AS AMENDED [¶] [Applicable language minority group(s)].") "It is the responsibility of covered jurisdictions to determine what languages, forms of languages, or dialects will be effective" to provide the assistance mandated by the Voting Rights Act. (28 C.F.R. § 55.11.)

The Census bureau issued its most recent coverage determinations for California and California counties on December 5, 2016.[5] (81 Fed.Reg. 87532–87533; see 28 C.F.R. § 55.4(a), (b).)

This census information established that, under section 203 of the Voting Rights Act, language assistance is mandated in California for languages spoken by the following

---

[5] These determinations were based on the 2010–2014, five-year American Community Survey data. (Research Rep. Series, *supra*, at p. iii.)

seven language groups within the four statutorily specified "language minority" groups (Asian American, American Indian, Alaskan Natives, or Spanish heritage; 52 U.S.C. § 10503(e)): Hispanic (statewide assistance), Chinese, Vietnamese, Filipino, Cambodian, Korean and American Indian. (81 Fed.Reg. 87533.)

### 2. *California Law (Section 14201)*

#### a. *The Relevant Statutory Provisions*

In 1976, one year after Congress amended the Voting Rights Act to extend its protections to "language minorities," the California Legislature enacted former section 14203 requiring the state-wide posting of facsimile ballots in Spanish. The statute provided specifically that: "The precinct board shall post in a conspicuous location in the polling place, at least one facsimile copy of the ballot with the ballot measures and ballot instructions printed in Spanish. Facsimile ballots shall also be printed in other languages and posted in the same manner if a significant and substantial need is found by the clerk. In those counties which are required under the provisions of the Voting Rights Act of 1965 as extended by Public Law 94-73 to furnish ballots in other than the English language, the posting of the facsimile ballot in that particular language shall not be required." (Stats. 1976, ch. 220, § 6, p. 408.) The state law facsimile posting requirement was thus an adjunct to the Voting Rights Act's mandate to furnish bilingual election materials in Spanish in counties subject to the federal Act. (*Ibid*.)

Six years later, in 1982, the Legislature amended former section 14203. (Stats. 1982, ch. 373, § 1, p. 1691.) These amendments made several significant changes, including eliminating statewide posting of Spanish language facsimile voting materials and requiring, instead, that the need for posting be determined on a precinct basis by the Secretary of State. (Assem. Com. on Elections and Reapportionment, analysis on Assem. Bill No. 742 (1981–1982 Reg. Sess.) as amended Jan. 4, 1982, pp. 1–2.)

The amendments also outlined the general methodology the Secretary was to use in determining language assistance needs. Specifically, "[i]n determining whether it is appropriate to post the election materials in Spanish or other languages, the Secretary of

State shall determine the number of residents of voting age in each county and precinct who are members of a *single language minority*, and who lack sufficient skills in English to vote without assistance.  If the number of these residents equals 3 percent or more of the voting age residents of a particular county or precinct, or in the event that interested citizens or organizations provide the Secretary of State with information which gives the Secretary of State sufficient reason to believe a need for the furnishing of facsimile ballots, the Secretary of State shall find a need to post at least one facsimile copy of the ballot with the ballot measures and ballot instructions printed in Spanish or other applicable language in the affected polling places."  (Former § 14203, subd. (b), added by Stats. 1982, ch. 373, § 1, p. 1691, italics added.)  The parties, thus, characterize this methodology as having a "mandatory" component based on the three percent threshold and a "discretionary" component based on information showing need for language assistance.  The amendments did not, however, define "language minority" or provide any guidance as to the terminology "single language minority."  (*Ibid*.)

As to languages for which bilingual voting materials were required under the Voting Rights Act, the statute continued to exempt counties from facsimile posting requirements.  (Former § 14203, subd. (a).)

In 1994, the substance of former section 14203 was relocated into section 14201.  (Stats. 1994, ch. 920, § 2; California Voting for All Act, Assem. Bill No. 918 (2017–2018 Reg. Sess.) § 9.)  No changes were made to the substantive provisions at issue here.

In 2017, the Legislature amended section 14201 to require not only that facsimile ballot materials be posted "in a conspicuous location in the polling place," but also that at least one facsimile ballot "be made available for voters at the polling place to use as a reference when casting a private ballot."[6]  (§ 14201, subd. (a).)  Additional copies must be available in precincts in which single language minority voting age residents who lack

---

[6] These facsimile ballots must "be sufficiently distinct in appearance from a regular ballot to prevent voters from attempting to vote on the facsimile copy."  (§ 14201, subd. (a).)

sufficient English proficiency exceed 20 percent of the voting age residents. (§ 14201, subd. (b)(2).) No substantive change was made to the methodology the Secretary is to employ in determining language assistance needs, or the frequency with which these determinations must be made. (§ 14201, subds. (b)(1) & (f).) The legislation also continued to exempt counties from state facsimile ballot posting and availability requirements to the extent they are required to provide bilingual election materials under the Voting Rights Act. (Compare former § 14203, subd. (a) with § 14201, subd. (g).)

### b. *Implementation by the Secretary of State*

In order to make the language assistance determinations required by state law, the Secretary "contracted with the California Statewide Database . . . to evaluate whether publicly available census data as well as the Census Bureau's American Community Survey . . . data set was sufficient" to implement the statute. The Secretary concluded the publicly-available data was not sufficient.

The statewide database therefore requested a special tabulation from the U.S. Census Bureau[7] of the state population estimates of persons that: (1) were 18 years of age or older (voting age); (2) spoke English less than very well; and (3) were from the following language group categories: Latino, American Indian/Alaska Native, Asian, Middle Eastern and North African language group summary categories as well as the languages available in the American Community Survey table subject to certain restrictions (e.g., if the language had less than 10,000 (weighted) respondents, then the entire language was not released, etc.). The record contains no information explaining why these particular "language groups" were identified.

---

[7] "Special tabulations are data sets that the Census compiles, by request, for projects for which the general, publicly available tabulations are not sufficient. Special tabulations are user-defined data requests that are assessed on a case-by-case basis by U.S. Census Bureau staff and the Census Disclosure Review Board to ensure that confidentiality and privacy requirements are maintained."

The special tabulation data set identified over 50 languages pertaining to the identified "language groups," 43 of which met a three percent threshold in at least one precinct somewhere in the state.

In utilizing this data for purposes of making the language assistance determinations required by state law (§ 14201, subds. (a) & (f)), the Secretary has consistently followed the practice of interpreting "single language minority" to include the specific language groups identified under the federal Voting Rights Act by the Director of the Census and published in the Federal Register. Thus, in making his most recent language assistance determinations, the Secretary used the 2016 section 203 language access determinations.

Of the 43 languages identified by the special tabulation data, 10 are associated with the seven language groups designated as "language minority" groups under the Voting Rights Act for California—Spanish, Chinese, Cantonese, Mandarin, Formosan, Vietnamese, Tagalog, Ilocano, Khmer, and Korean. (81 Fed.Reg. 87533–87534.) Accordingly, the Secretary identified these 10 languages as within "mandatory" coverage under state law. In addition, pursuant to his "discretionary" authority, the Secretary identified six more languages for which assistance is to be provided under state law: Arabic, Armenian, Persian, Hmong, Punjabi, and Syriac.

On December 29, 2017, the Secretary issued memorandum No. 17148 to all county clerks and registrars of voters identifying the "precincts throughout the state that qualify for mandatory language assistance" in connection with the 16 languages the Secretary identified.

### 3. *The Dispute Between the Parties*

Four months after the Secretary issued memorandum No. 17148, plaintiffs filed the instant writ proceeding and action for declaratory and injunctive relief, challenging the Secretary's interpretation and implementation of section 14201.

Specifically, plaintiffs claimed the Secretary (1) "improperly required language assistance only in the precincts where the three percent trigger was met," rather than county-wide and (2) "improperly confined the universe of languages covered by state law

to the small group of languages covered under a more restrictive and inapplicable federal statute." (Italics omitted.)

As to their claim that language assistance must be provided county-wide even if only certain precincts meet the three percent requirement, plaintiffs maintained "[t]he decision to not make coverage determinations at the county level has an enormous impact on the number of voters who will get language assistance." Plaintiffs alleged, for example, that "18 counties" meet the three percent threshold for Spanish, "but the Secretary only required coverage in Spanish in *particular precincts* within those counties that also hit the three percent threshold," thus "depriv[ing] nearly 6,400 Spanish . . . speaking Californians of the language assistance to which they are entitled under state law." All told, plaintiffs claimed the Secretary's precinct focus had resulted in "the denial of language assistance to an estimated 80,141 Californians," who allegedly are "entitled to receive such assistance" under state law.

As to their claim that the Secretary has improperly referred to the Voting Rights Act's definition of " 'language minorit[ies]' " and "language minority groups," plaintiffs maintained that given the "diversity of California's population," Californians who speak "such languages . . . [as] Arabic, Farsi, Russian, Ukrainian, Syriac, and Amharic . . . have been automatically and improperly excluded from the . . . mandatory coverage determination[s]." Plaintiffs assert the federal definition of " 'language minorit[ies]' " "makes no sense, as it is both over- and under-inclusive," since it excludes persons of "African, Middle Eastern and Eastern European descent," but includes "persons with (at best) a minimal presence in California, such as Alaskan Natives." According to plaintiffs, a more appropriate definition of "language minority" is "anyone who speaks English other than '[v]ery well.' " Plaintiffs further alleged that in basing his language assistance determinations on the determinations of the Director of the Census and Attorney General under the Voting Rights Act, the Secretary has effectively applied the higher federal threshold (five percent) for assistance, rather than the lower state law threshold (three percent).

10

After the trial court overruled a demurrer by the Secretary, plaintiffs moved for issuance of a writ of mandate.

The Secretary took the position plaintiffs could point to no mandatory ministerial duty with which he had failed to comply. The Secretary maintained precinct-level language assistance determinations are consistent with both the language of section 14201 and the Legislature's intent. In this regard, the Secretary provided declarations from the Interim Registrar of Voters for Sacramento County and the Assistant County Registrar of Voters for Contra Costa County detailing the costs of translating ballot materials into the languages currently mandated by the Secretary and the projected costs for translating the materials in all languages meeting the three-percent threshold "in a precinct."[8] As for his reliance on the Voting Rights Act, the Secretary pointed out state law does not define "single language minority" and maintained it is not an abuse of discretion to look to the Act which uses the identical terminology and provides definitional guidance in implementing this terminology.

At the hearing on plaintiffs' motion for issuance of a writ, the trial court provided a detailed recitation of its tentative ruling.

The court first addressed plaintiffs' claim that section 14201 requires county-wide language assistance if any precinct therein meets the three percent threshold. The court observed the statute is not "plain on its face" or a "model of clarity." While it agreed with plaintiffs "the word county c[ould] be seen as superfluous if the Secretary's view is taken," the court went on to observe the statute also speaks in terms of "affected polling

---

[8] In a footnote in his opposing memorandum, the Secretary noted "17 of the 18 counties identified in Petitioner's opening brief are already providing translated facsimile ballot material or other translated ballots in Spanish or Punjabi (in Sutter County) county-wide. [Citations.] In light of this information, the Secretary of State is reviewing its current policy of precinct-level application, and is considering a possible policy change. [Citation.] However, implementing such policy changes statewide is not likely feasible before November. [Citation.] The Secretary of State therefore proceeds in defending the current policy, and will notify the Court and all parties if he enacts any policy change regarding this issue."

places," suggesting not all polling places are included, but only those polling places with need for language assistance. Use of the terminology "affected polling places," said the court, indicates there are also "unaffected polling places." (Italics omitted.) But under plaintiffs' construction, language assistance would be required in "all polling places within any county that has three percent. So there aren't affected polling places and unaffected polling places; they're all affected." (Italics omitted.)

The court next discussed the legislative history of the relevant statutory provisions.[9] The court concluded this history supported the Secretary's reading of the statute, the 1982 legislative history being particularly persuasive. The court observed this history is replete with statements that "the language assistance requirements . . . 'serve no useful purpose in those areas where there's no demonstrable need' " and one of the principle purposes of the 1982 amendments was to replace the state-wide Spanish facsimile posting requirement with a precinct-focused assessment of language assistance need.

The court then considered the reasonableness of the parties' varying views of the scope of the statute, and concluded the Secretary also had the stronger case in this regard. Using El Dorado County as an example, the court observed "petitioner's proposed construction would have the county bear cost to provide Spanish language materials in 464 precincts where nobody needs them" because even though the "three percent threshold of Spanish speakers is met county-wide," only "282 of the county's 746 precincts have any Spanish-speaking voting-aged residents with limited English proficiency."[10]

---

[9] At the Secretary's request, the trial court took judicial notice of portions of the legislative history of section 14201. After notice to the parties, we have, on our own motion, taken judicial notice of additional legislative history of the original enactment of the legislation in 1976, the 1982 amendments, and the 2017 amendments. (Evid. Code, § 459.)

[10] On appeal, plaintiffs contend the trial court erred in taking judicial notice of an e-mail from the Secretary's office to El Dorado County. The Secretary maintains the e-mail was properly noticed because it was "part of the official information issued by the

The court next addressed plaintiffs' claim that the Secretary had improperly looked to the Voting Rights Act in interpreting and applying the terminology "single language minority." The court again concluded the language of the state statute was unclear, observing "single language minority" is "not a commonly-used term" and it is not defined anywhere in the Elections Code. The term is, however, used in the Voting Rights Act, and given the "timing of the passage of these acts and the tight relationship between the two of them," as shown by the legislative history, the court concluded the Secretary's reference to the federal Act's definition of "language minorities" and "language minority group[s]" was reasonable.

After hearing argument and taking the matter under submission, the trial court issued an order memorializing its tentative rulings and denying plaintiffs' request for issuance of a peremptory writ. The court entered judgment two weeks later.

### III. DISCUSSION

#### A. *Standard of Review*

Our standard of review in this appeal from the denial of a writ of ordinary mandamus (Code Civ. Proc., § 1085) challenging the Secretary's interpretation of section 14201 is well-established. Where the facts are undisputed and the issue is one of statutory interpretation, we review the trial court's ruling de novo.[11] (See *City of*

---

Secretary to county elections officials, pursuant to Memorandum #17148, which noted that '[i]ndividual precinct data listing information for both [section] 14201 and non-14201 languages will be provided to each county via email.' " In its order denying plaintiffs' motion for issuance of a peremptory writ, the court stated, "The parties wrangle over whether I should take judicial notice of El Dorado County facts. The argument is immaterial, as petitioners concede that many precincts statewide 'have no voting-age residents requiring language assistance.' (Mem. 13:1–4.)" Regardless of this observation by the lower court, we agree this e-mail was properly noticed. (See *In re Social Services Payment Cases* (2008) 166 Cal.App.4th 1249, 1271–1272 ["trial court properly exercised its discretion in taking judicial notice of the All County Letters" because as "official acts of the state's executive department" they were the "proper subjects of judicial notice"].)

[11] While the Secretary maintains a writ of mandamus under Code of Civil Procedure section 1085 may issue "only to correct an abuse of discretion that exceeds an

13

*Alhambra v. County of Los Angeles* (2012) 55 Cal.4th 707, 718; *Department of Health Care Services v. Office of Administrative Hearings* (2016) 6 Cal.App.5th 120, 140–141.)

**B.** *Principles of Statutory Construction*

" 'Under well-established rules of statutory construction, we must ascertain the intent of the drafters so as to effectuate the purpose of the law.  [Citation.]  Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context.  [Citation.]  When statutory language is clear and unambiguous, " 'there is no need for construction and courts should not indulge in it.' " ' " (*Bernard v. City of Oakland* (2012) 202 Cal.App.4th 1553, 1560–1561.)

However, "[w]hen the plain language of the statute does not resolve the interpretive question, we proceed to the second step of our inquiry.  At this stage, we 'may turn to rules or maxims of constructions "which serve as aids in the sense that they express familiar insights about conventional language usage." '  [Citations.]  In addition, '[i]f the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 582–583 (*Ailanto Properties*).)

"If the meaning of the statute remains unclear after examination of both the statute's plain language and its legislative history, then we proceed cautiously to the third and final step of the interpretive process.  [Citation.]  At this final stage of the process, we apply 'reason, practicality, and common sense to the language at hand.'  [Citation.]  The words of the statute should be interpreted 'to make them workable and reasonable.'

<hr>

agency's legal powers," and that an appellate court must determine whether " 'the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, or whether the agency failed to follow the procedure and give notices the law requires,' " giving great deference to the agency's interpretation, action that contravenes state law is, by definition, an abuse of discretion.  Thus, the Secretary ultimately acknowledges, as he must, that a writ proceeding that turns on statutory interpretation presents a question of law subject to de novo review.

14

[Citation.] We will also consider the consequences that will flow from a particular statutory interpretation. [Citation.] 'In determining what the Legislature intended we are bound to consider not only the words used, but also other matters, "such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction." ' " (*Ailanto Properties, supra*, 142 Cal.App.4th at p. 583.)

**C.** *Interpretation and Application of Section 14201*

**1.** *Precinct-Focused Application*

Plaintiffs maintain, as they did in the trial court, that the Secretary has erred in making his language assistance determinations on a precinct basis, rather than a county-wide basis. They contend, specifically, that the Secretary's precinct focus renders the word "county" in the statute surplusage, and as a matter of statutory construction, such an interpretation must be avoided. They further maintain the Secretary's precinct focus undermines the remedial purpose of the statute.

Section 14201 provides, in pertinent part:

"In determining if it is appropriate to provide the election materials in Spanish or other languages, the Secretary of State shall determine the number of residents of voting age in each *county and precinct* who are members of a single language minority, and who lack sufficient skills in English to vote without assistance. If the number of these residents equals 3 percent or more of the voting-age residents of a particular *county or precinct*, or if interested citizens or organizations provide the Secretary of State with information that gives the Secretary of State sufficient reason to believe a need for the furnishing of facsimile ballots, the Secretary of State shall find a need to provide at least two facsimile copies with the ballot measures and ballot instructions printed in Spanish or other applicable language in the affected polling places." (§ 14201, subd. (b)(1), italics added.)

We agree with the trial court that section 14201, like many statutes, is not a model of clarity and its language is open to varying interpretations, including that urged by plaintiffs and that employed by the Secretary for more than three decades.

While as a general matter, any interpretation that renders statutory language surplusage is to be avoided, this is simply one of numerous aides in construction, and it does not override the primary objective of statutory construction, which is to effectuate

15

the Legislature's intent. (*People v. Townsend* (1998) 62 Cal.App.4th 1390, 1399 ["[A]voidance of surplusage, while an important principle of statutory construction, is nonetheless subordinate to the overriding purpose of effectuating legislative intent."].) We therefore turn, as did the trial court, to the relevant legislative history.

Prior to the 1982 amendments to then section 14203 (now section 14201), "*all counties* [were] required to provide some type of written Spanish-language voting assistance." (Sen. Com. on Elections & Reapportionment, Analysis of Assem. Bill No. 742 (1981–1982 Reg. Sess.) as amended Jan. 18, 1982, p. 1, italics added.) The 1982 amendments eliminated this "all counties" mandate, and, as we have discussed, added the general methodology the Secretary is to use in making language assistance determinations and which uses the terminology "single language minority."

Numerous committee reports and bill analyses set forth the Legislature's stated purpose in this regard. For example, the Assembly Office of Research report on the concurrence in Senate amendments explained: "Under current California law and under the federal Voting Rights Act of 1965 (as extended by Public Law 94-73), certain California counties are not required to provide bilingual voting materials. However, under current California law, those counties not required to provide bilingual voting materials are required to post in each precinct specified language minority election materials. This bill would allow those counties which do not have sufficient language minority populations, as determined by the Secretary of State, to avoid the cost of preparing and posting language minority election materials. The Secretary of State would be required to make an initial determination by December 31, 1983. Thereafter, she would be required to make such determinations by January 1 of those years in which the Governor is elected." (Assem. Off. of Research, Conc. of Sen. Amend., Assem. Bill No. 742 (1981–1982 Reg. Sess.) as amended May 5, 1982, p. 2.)

Specifically, "AB 742 would eliminate the Spanish facsimile ballots in all non-Voting Rights Act *precincts* except those in which the Secretary of State determines a 'significant and substantial need' exists." (Sen. Com. on Elections & Reapportionment, Analysis of Assem. Bill No. 742, *supra*, as amended Jan. 18, 1982, p. 1, italics added; see

16

also, e.g., Assem. Com. on Elections & Reapportionment, Assem. Bill No. 742, *supra*, as amended Jan. 4, 1982, pp. 1–2 ["This bill provides that facsimile ballots in Spanish are required in non-Voting Rights Act counties only if the Secretary of State determines that it is appropriate. It also specifies that the Secretary of State may find that only *certain precincts* within a county require facsimile ballots in Spanish. [¶] . . . [¶] Advocates of the Voting Rights Act and of facsimile ballots in Spanish, as these provisions are currently being implemented in California, agree that these provisions serve no useful purpose in those areas where there is no demonstrable need"; "[t]he bill establishes criteria for the Secretary of State that are based on Elections Code Section 1635(c), which have been effective in determining need, on a *precinct by precinct* basis, for bilingual assistance at the polling place" (italics added)[12]]; Assem. Com. on Elections & Reapportionment, Assem. Bill. No. 742, *supra*, as amended May 13, 1981, p. 1 ["bill further requires that facsimile copies of the ballot and ballot instruction shall be printed and posted in other languages in *precincts* (or counties) where the Secretary of State determines need"].)

It is also significant that by the time of the 1982 amendments, the Secretary had begun to identify specific precincts as to which there was no need for language assistance. (See Assem. Com. on Elections & Reapportionment, Assem. Bill. No. 742, *supra*, as amended May 13, 1981, p. 2 [As to some counties, Secretary of State has determined "no reasonable need exists for covering the entire county with bilingual sample ballots, etc., and has so advised these counties. This determination has resulted in

---

[12] In fact, this committee report utilizes the exact phraseology plaintiffs now assert requires county-wide, rather than precinct, focus: "The bill specifies that where the Secretary of State finds that 3% of the residents *of a precinct or county* are of a single language minority at least one facsimile copy of the ballot with the ballot measures and ballot instructions printed in the applicable language shall be posted in the affected polling place." (Assem. Com. on Elections & Reapportionment, Assem. Bill No. 742, *supra*, as amended Jan. 4, 1982, p. 2.) However, read in its entirety, this report makes clear, as do many other committee reports, that one of the principle purposes of the 1982 amendments was to eliminate the all-counties posting requirement and to authorize the Secretary to use a precinct approach.

cost savings in these counties as well as relieving county elections officials of the onerous duty of defending mandated practices that appear to have no basis in common sense."].) Not only did the Legislature not criticize these efforts, it endorsed them.[13]

As amended, section 14203 (now section 14201) stated in pertinent part:

"(b) . . . In *counties* where the Secretary of State has determined that it is appropriate, each precinct board shall post, in a conspicuous location in the polling place, at least one facsimile copy of the ballot with the ballot measures and ballot instructions printed in Spanish. If the Secretary of State determines that it is appropriate to post the election materials in Spanish *in only certain precincts in the county*, the material shall be posted in the polling places situated in those precincts. Facsimile ballots shall also be printed in other languages and posted in the same manner if a significant and substantial need is found by the Secretary of State.

"In determining whether it is appropriate to post the election materials in Spanish or other languages, the Secretary of State shall determine the number of residents of voting age in *each county and precinct* who are members of a single language minority, and who lack sufficient skills in English to vote without assistance. If the number of these residents equals 3 percent or more of the voting age residents of a *particular county or precinct*, or in the event that interested citizens or organizations provide the Secretary of State with information which gives the Secretary of State sufficient reason to believe a need for the furnishing of facsimile ballots, the Secretary of State shall find a need to post at least one facsimile copy of the ballot with the ballot measures and ballot instructions printed in Spanish or other applicable language in the affected polling places." (Former § 14203, subd. (b), added by Stats. 1982, ch. 373, § 1, p. 1691, italics added.)

---

[13] In a bill analysis prepared by the then Secretary of State, she commented the legislation contained "potentially troublesome language," noting the requirement that the Secretary make the three percent determination for "a county or precinct." (Fong Eu, Sec. State Bill Analysis, Assem. Bill. No. 742 (1981–1982 Reg. Sess.) as amended Jan. 4, 1982, p. 2, underscoring omitted.)  The Secretary asked whether this would mean that a county with a "3% Spanish-speaking population" would have to post facsimile ballots "in all precincts, regardless of whether an individual precinct had a 3% Spanish-speaking population," and suggested if this was not the Legislature's intent, it should delete the word " 'county.' "  The Secretary, however, did not have the benefit of the many other committee reports making clear the Legislature intended that materials be posted only in precincts where there is a need for language assistance.

When the Legislature amended the statute in 2017, it altered this language in three pertinent respects: It revised the language of the first paragraph (which at that point was set forth in section 14201, subdivision (a)). (Legis. Counsel's Dig., Assem. Bill No. 918 (2017–2018 Reg. Sess.) introduced Feb. 16, 2017, § 6.) It retained the methodology language of the second paragraph (which at that point was set forth in section 14201, subdivision (b)) (Legis. Counsel's Dig., Assem. Bill No. 918, *supra*, introduced Feb. 16, 2017, § 6), as subdivision (b)(1). And it added a new mandate that four facsimile ballots be provided in precincts where a single language minority exceeds 20 percent of the voting age residents as subdivision (b)(2).

Thus, the statute now reads in pertinent part:

"(a) In *counties and precincts* where the Secretary of state has determined that it is appropriate, the county elections official shall provide facsimile copies of the ballot, as described in subdivision (b), with the ballot measures and ballot instructions printed in Spanish, one of which shall be posted in a conspicuous location in the polling place and at least one of which shall be made available for voters at the polling place to use as a reference when casting a private ballot. . . .

"(b)(1) In determining if it is appropriate to provide the election materials in Spanish or other languages, the Secretary of State shall determine the number of residents of voting age in *each county and precinct* who are members of a single language minority, and who lack sufficient skills in English to vote without assistance. If the number of these residents equals 3 percent or more of the voting-age residents of a *particular county or precinct*, or if interested citizens or organizations provide the Secretary of State with information that gives the Secretary of State sufficient reason to believe a need for the furnishing of facsimile ballots, the Secretary of State shall find a need to provide at least two facsimile copies with the ballot measures and ballot instructions printed in Spanish or other applicable language in the affected polling places.

"(2) If the Secretary of State determines that the number of voting-age residents *in a precinct* who are members of a single language minority and who lack sufficient skills in English to vote without assistance exceeds 20 percent of the voting-age residents in that precinct, the county elections official shall provide at least four facsimile copies of the ballot in the language of that language minority, one of which shall be posted in a conspicuous location in the polling place and at least three of which shall be made available for voters at the polling place to use as a reference when casting a private ballot." (§ 14201, subds. (a), (b)(1)–(2).)

19

While the language of section 14201 subdivisions (a) and (b)(1) remains largely the same as that added by the 1982 amendments, it no longer includes the sentence in former subdivision (a) of section 14201 and before that, in the first paragraph of former section 14203, subdivision (b) that expressly stated, "If the Secretary of State determines that it is appropriate to post the election materials in Spanish *in only certain precincts in the county*, the material shall be posted in the polling places situated in those precincts." (Italics added.)  At oral argument, plaintiffs asserted this omission reflected an intent by the Legislature in 2017 to repudiate the precinct-based focus it had adopted in 1982, and therefore the Secretary must once again make county-wide, rather than precinct focused, language assistance determinations.

However, nothing in the legislative history of the 2017 amendments supports this view.  To begin with, while the Legislature excised the sentence in question from section 14201, subdivision (a), it added the word "precincts" at the outset of the subdivision, so that instead of stating, "In counties where the Secretary of State has determined that it is appropriate," the statute now states "In counties and precincts where the Secretary of State has determined that it is appropriate."  (See Legis. Counsel's Dig., Assem. Bill No. 918, *supra*, introduced Feb. 16, 2017, § 6; *Id*. as amended May 30, 2017, § 6; *Id*. as approved and filed Oct. 15, 2017, § 9.)  Thus, the retooled language of section 14201, subdivision (a) appears to reflect an editing change without substantive consequence.

More significantly, the committee reports on the proposed 2017 legislation made repeated reference to the Secretary's precinct-based application of the statute.  For example, the Assembly Committee on Elections and Redistricting report described "existing law," in relevant part, as follows:

> "Requires the SOS, by January 1 of each year in which the Governor is elected, to determine the *precincts* where three percent of more of the voting age residents are members of a single language minority and lack sufficient skills in English to vote without assistance.  Requires county elections officials, for *each specified precinct* in their county, to do the following:
> "a) Translate a facsimile ballot and related instructions in the specified language(s); and,

20

"b) Post the translation(s) in a conspicuous location in the appropriate polling place. [¶] . . . [¶]

"Provides that in determining whether it is appropriate to require a county to post a copy of the ballot at the *precinct* in a language other than English, the SOS shall find a need to post such translated copies of the ballot if the number of residents of voting age in the *precinct* who are members of a single language minority and who lack sufficient skills in English to vote without assistance equals three percent or more of the voting age residents in the *precinct*." (Assem. Com. on Elections & Redistricting, Assem. Bill No. 918, *supra*, as amended Mar. 29, 2017, p. 4, italics added.)

(See Assem. Com. on Appropriations, Assem. Bill No. 918 (2017–2018 Reg. Sess.) as amended Mar. 29, 2017, p. 2 [same]; Sen. Com. on Elections & Constitutional Amends., Assem. Bill No. 918 (2017–2018 Reg. Sess.) as amended July 6, 2017, p. 2, 5 [same]; Sen. Com. on Appropriations, Assem. Bill No. 918, *supra*, as amended Aug. 21, 2017, p. 1 [same]; Sen Rules Com., 3d Reading, Assem. Bill No. 918 (2017–2018 Reg. Sess.) as amended Aug. 21, 2017, pp. 2–3 [same].) There is, in short, no suggestion in any committee report or bill analysis that the 2017 amendments changed this significant aspect of the law.

Had the Legislature been dissatisfied in this regard, it could have, and undoubtedly would have, said so and amended the statute to eliminate any reference to "precinct." (See *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 520 [had the Legislature "wanted to authorize a motion to dismiss . . . without invoking" a specified statue "it could have easily done so by simply deleting" reference to that statute].) Indeed, the Legislature has been particularly active in this area of the law and has not hesitated to amend the statute to ensure that it effectuates its intent.

Furthermore, since the 1982 amendments, the Secretary has consistently made language assistance determinations on a precinct basis. The Legislature is not only deemed to be aware, but the legislative history demonstrates it has been fully aware of the Secretary's precinct-focused application of the law. (E.g., Assem. Com. on Elections & Redistricting, Assem. Bill No. 918, *supra*, as amended Mar. 29, 2017, p. 4.) That the Legislature has never taken any action to change the Secretary's implementation is "a

21

strong factor indicating that the administrative practice was consistent with the Legislature's intent."  (*El Dorado Oil Works v. McColgan* (1950) 34 Cal.2d 731, 739 (*El Dorado Oil Works*).)

We therefore conclude, as did the trial court, that the Secretary's precinct-based focus is consistent with both the language of section 14201 and the Legislature's intent.[14]

### 2.  *"Single Language Minority"*

Plaintiffs also maintain, as they did in the trial court, that the Secretary has erroneously referred to the Voting Rights Act in construing and applying the terminology "single language minority."  At oral argument it became evident plaintiffs' challenge to the Secretary's reference to federal law is two-pronged.  They first assert the Secretary's reference to the Voting Rights Act's definition of "language minorities" and "language minority group[s]" leaves numerous voters with limited English proficiency without assistance under state law, and thus is contrary to the Legislature's intent.  They second claim the Secretary has gone beyond looking to the Voting Rights Act's definitional language, and has imported the Act's five percent threshold into his "mandatory" language assistance determinations under state law.  While we conclude the Secretary has not erred or abused his discretion in looking to the Voting Rights Act's definition of "language minorities" and "language minority group[s]" and regulatory guidance as to "single language minority," we agree with plaintiffs that the Secretary has done more than that, and his current methodology erroneously imports the federal Act's five percent threshold into his implementation of state law.

---

[14]  Plaintiffs point out precinct-by-precinct application results in some limited English proficient voters not receiving assistance.  However, the Legislature did not enact a statutory scheme that applies to every voter with limited English proficiency.  For example, the three percent "mandatory" threshold, while lower than the federal five percent threshold, necessarily means some language minority voters with limited English proficiency will not come within the state law.  Similarly, while a precinct focus may exclude some language minority voters, it is solely within the Legislature's prerogative to balance the policy considerations bearing on the scope and reach of this statute.

### a. *Reliance on the Voting Rights Act Definitional Language and Implementing Regulatory Provisions*

As we have discussed, both section 14201 and the Voting Rights Act use the identical terminology "single language minority." (§ 14201, subd. (b)(1); 52 U.S.C. § 10503(b)(2)(A)(i).) State law does not define the terms "language minorities" or "language minority group[s]," or the terminology "single language minority." However, the Voting Rights Act expressly defines the terms "language minorities" and "language minority groups" to mean "persons who are American Indian, Asian American, Alaskan Natives, or of Spanish heritage." (52 U.S.C. § 10503(e); 28 C.F.R. § 55.1.) The implementing regulations provide further guidance as to the terminology "single language minority." (28 C.F.R. §§ 55.11, 55.6(c).) It is undisputed the Secretary has looked to the federal Act's definitional and regulatory provisions in implementing state law.

Plaintiffs claim this cannot be what the Legislature intends, pointing to the remedial nature of the legislation and asserting the federal definitional language "is both over- and under-inclusive," since it excludes persons of "African, Middle Eastern and Eastern European descent," many of whom reside in California, but includes "persons with (at best) a minimal presence in California, such as Alaskan Natives." Plaintiffs maintain "single language minority" must, under state law, mean that assistance is required "[w]henever limited English proficient, voting-age residents who use any one language ('a single language') meet the three percent threshold."

The Secretary disagrees, pointing out section 14201 does not use the language "voters speaking 'any one language,' " but rather, uses the specific terminology " 'members of a *single language minority.*' " The Secretary further points out "single language minority" is not a commonly-used term and maintains the legislative history makes clear the Legislature was well aware of the provisions of the Voting Rights Act, including its use of the identical terminology and definition of "language minorities" and "language minority group[s]." The Secretary thus concludes he is acting within his authority in referring to the federal Act's definitional language in making the

23

"mandatory" language assistance determinations required under state law. He further points out state law not only provides for language assistance determinations based on the three percent threshold methodology set forth in section 14201, but additionally provides for assistance determinations based on a showing of need, a provision that finds no analog in the federal Act and a provision the Secretary has used to extend coverage under state law to additional language groups.

We again agree with the trial court that the meaning of "single language minority" is not self-evident from the plain language of the statute, and therefore turn to the legislative history for assistance in determining whether the Secretary has appropriately referred to the Voting Rights Act's definitional language and regulatory guidance.

As we have recited, the terminology "single language minority" was added to the state statute in 1982, when the Legislature first included the provisions setting forth the general methodology the Secretary is to use in making the "mandatory" language assistance determinations (based on the three percent threshold). The legislative history of the 1982 amendments makes clear not only that the Legislature was focused on replacing the all-county mandate to post facsimile ballots in Spanish with a precinct-based focus, but also that the Legislature was well aware of the requirements of the Voting Rights Act, including the Act's specific reference to "language minorities." (E.g., Assem. Off. of Research Report, Sen. Conc. Amends. to Assem. Bill No. 742 (1981–1982 Reg. Sess.) as amended May 5, 1982, p. 2; Assem. Com. on Elections & Reapportionment, Assem. Bill No. 742, *supra*, as amended Jan. 4, 1982, p. 1 [acknowledging Secretary of State "has had considerable experience with implementation of both *federal* and state statutes *relating to language minorities*" and had "conducted extensive studies in 46 counties to determine the need for minority language assistance" (italics added)].)

Had the Legislature intended this terminology to have a different meaning under state law it could have, and undoubtedly would have, said so. (See *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 974, 977 [concluding Legislature must have intended the same meaning as used in federal statute when it

24

adopted "almost verbatim the federal statutory definition" and "could have expressly provided" for a "contrary" meaning but did not do so].) This is underscored by the fact the Legislature did not adopt the Voting Rights Act's five percent threshold, but, instead, expressly adopted a lower, three percent, threshold for "mandatory" language assistance determinations. The Legislature also included a provision for language assistance determinations based on a showing of need, a provision not found in the federal Act. Thus, when the Legislature has intended there to be a significant difference between the state and federal statutory provisions, it has specified as much.

The legislative history of the 2017 amendments is also telling. As we have discussed, this legislation enhanced facsimile requirements to require not only the posting of such voting materials, but also to provide facsimile ballots for use in the voting booth. (§ 14201, subds. (a), (b)(2).) It also continued to except counties from state facsimile requirements to the extent they are required, under the Voting Rights Act, to provide bilingual election materials. (Assem. Com. on Appropriations, Assem. Bill No. 918, *supra*, as amended Mar. 29, 2017, p. 1; Assem. Com. on Elections & Redistricting, Assem. Bill No. 918, *supra*, as amended Mar. 29, 2017, p. 1; cf. § 14201 with former § 14203.)

The legislative history of the 2017 amendments discussed the Voting Rights Act in some detail, including specifically pointing out the Act's definition of "language minorities" and "language minority groups." (E.g. Sen. Com. on Elections & Constitutional Amends., Assem. Bill No. 918, *supra*, as amended July 6, 2017, p. 1 [summarizing existing federal law, including pointing out it "[d]efines language minorities or language minority groups, for the purposes [of that law], to mean persons who are American Indian, Asian American, Alaskan Natives, or of Spanish heritage"]; Assem. Com. on Elections & Redistricting, Assem. Bill No. 918, *supra*, as amended Mar. 29, 2017, p. 3 [same], p. 5 ["In 1975, Congress adopted the language minority provisions of . . . the VRA. Congress extended these provisions in 1982, 1992, and 2006. [These sections] of the VRA require certain jurisdictions with significant populations of voting age citizens who belong to a language minority community to provide voting materials in

25

a language other than English. These determinations are based on data from the most recent Census."].)

This history also specifically discussed the 2016 Census data. The Assembly Committee on Elections and Redistricting report stated: "On December 5, 2016, the U.S. Census Bureau released its most recent determination of minority language requirements under Section 203 of the VRA. Pursuant to Section 203, the State of California is required to provide bilingual voting assistance to Spanish speakers. Additionally, pursuant to Section 203, 26 of California's 58 counties are individually required to provide bilingual voting assistance to Spanish speakers, and 10 counties . . . are required to provide voting materials in at least one language other than English and Spanish. [¶] In addition, existing state law requires the SOS, in each gubernatorial election year, to determine the precincts where three percent or more of the voting age residents are members of a single language minority and lack sufficient skills in English to vote without assistance. According to a December 13, 2013 memo from the SOS's office, the SOS contracted with U.C. Berkeley *to determine which precincts have reached the three percent threshold* in the *nine languages that were covered in California at the time under federal law* (Spanish, Chinese, Hindi, Japanese, Khmer, Korean, Tagalog, Thai and Vietnamese). According to the memo, based on the analysis data, the SOS has determined that most counties show an increase in the number of precincts with individuals who speak the nine languages that are covered. Depending on the data, the county elections officials will be required to translate a copy of the ballot and related instructions into the languages indicated and post them at the appropriate polling places." (Assem. Com. on Elections & Redistricting, Assem. Bill No. 918, *supra*, as amended Mar. 29, 2017, p. 6.) This report then listed all 58 counties and identified which counties now met the three percent state law threshold as to any of *the nine languages covered by the federal Voting Rights Act.* (*Id.*, at pp. 6–7.)

Additionally, this legislative history reflects that the legislation was focused on assisting limited English proficient voters *not* assisted under the Voting Rights Act, to ensure that these voters, like voters protected by the federal Act, receive meaningful

26

access to election materials. As the Assembly Committee on Elections and Redistricting report explained: "California is home to 6.8 million individuals who are limited-English proficient (LEP). While Section 203 of the Federal Voting Rights Act guarantees language access protections for many limited-English proficient voters, roughly 550,000 Latinos and Asian Americans who are limited-English proficient live in *counties not covered by Section 203*, and thus rely on state law for language access in voting. However, California's current language access requirements are not sufficient to provide meaningful language assistance to limited-English proficient in-person voters, provide zero assistance for many limited-English proficient vote-by-mail voters, and lack any reporting or oversight mechanisms." (Assem. Com. on Elections & Redistricting, Assem. Bill No. 918, *supra*, hearing date Apr. 5, 2017, as amended Mar. 29, 2017, pp. 4–5, italics added; see *id.,* at pp. 8–9 ["The vast majority of Californians who need language assistance when voting receive it under Section 203 of the federal Voting Rights Act. However, California currently fails the hundreds of thousands of limited-English proficient residents who live in counties not covered by Section 203, and who instead receive language access protections under the terms of state law, which only requires the posting of a facsimile ballot and encourages the recruitment of bilingual poll workers. These requirements are not sufficient. . . ."].)

Thus, there is no indication in the legislative history of section 14201 that the Legislature is of the view that there is a serious defect in the protections afforded by the Voting Rights Act. On the contrary, the legislative history has not only consistently referred to the federal Act, but the history of the most recent amendments specifically refers to the Voting Rights Act's definition of "language minorities" and "language minority groups" and discusses which counties currently have obligations under federal *and* state law by virtue of residents whose language fluency is in one of the languages covered by the Voting Rights Act.

Moreover, since the 1982 amendments adding the general methodology for language assistance determinations and the specific terminology "single language minority," the Secretary has consistently referred to the Voting Rights Act's definition of

27

"language minorities" and "language minority groups" to aid in the implementation of the statute. While the Legislature has since amended the statute several times, it has made no change to its terminology or to the provisions outlining the methodology the Secretary is to use in making language assistance determinations—a strong indication the Legislature believes the Secretary's reference to the federal definitional language in implementing state law is consistent with the language and purpose of the statute. (See *El Dorado Oil Works, supra*, 34 Cal.2d at p. 739.)

While plaintiffs maintain it is "illogical" to refer to the Voting Rights Act's definition of "language minorities" and "language minority groups" because, given California's current population, it is both over- and under-inclusive (e.g., because it includes Alaskan Natives, who have little presence in California, but excludes those of African and Middle Eastern heritage, who have a greater presence in the state), this is a matter plaintiffs must put before the Legislature. We are not at liberty to disregard the Legislature's chosen and unique terminology, the compelling legislative history pertaining to this issue, or the Legislature's knowing acquiescence to the Secretary's decades-long practice of referring to the Voting Rights Act's definitional language and regulatory guidance.

Furthermore, as the Secretary points out, in addition to the "mandatory" language assistance determinations required under section 14201, the Legislature has also specified the Secretary "shall find a need" on a showing of "sufficient reason to believe" there is a need for language assistance. (§ 14201, subd. (b)(1).) Thus, the Legislature included within the methodology the Secretary is to use a ready tool to expand language assistance to meet the needs of California's changing population, and the Secretary has acted under this statutory provision to do so.

We therefore conclude, as did the trial court, that the Secretary did not err or abuse his discretion in referring to the Voting Rights Act's definitional language and regulatory guidance in making the "mandatory" language assistance determinations required under section 14201.

### b. *The Voting Rights Act's Higher (Five Percent) Threshold*

In addition to claiming the Secretary has improperly referred to the Voting Rights Act's definitional language in interpreting and applying the terminology "single language minority," plaintiffs claim the Secretary has gone farther than that and improperly imported the federal Act's five percent threshold into his "mandatory" language assistance need determinations under state law. On this point, we agree with plaintiffs.

At oral argument, the Secretary acknowledged his language assistance need determinations are grounded on the Voting Rights Act coverage determinations of the Director of the Census and the Attorney General published in the Federal Register and appended to the implementing regulations. (28 C.F.R. § 55.4(a) & (b); "APPENDIX TO PART 55—JURISDICTIONS COVERED UNDER SECTIONS 4(f)(4) AND 203(c) OF THE VOTING RIGHTS ACT OF 1965, AS AMENDED [¶] [Applicable language minority group(s)]".) The Secretary expressed the view that these determinations provide what can be termed as an operational definition of "single language minority."

However, the Secretary has confused the Voting Rights Act's *definitional* language (and corresponding regulatory guidance) (52 U.S.C. § 10503(e); 28 C.F.R. §§ 55.1, 55.6(c), 55.11, 55.12) with the *coverage determinations* made under the Act (52 U.S.C. § 10503(b)(2); 28 C.F.R. § 55.4). In other words, the Director of the Census and the Attorney General are not charged with defining "language minorities" or "language minority group[s]," or even the terminology "single language minority"—this terminology is defined and/or explained by the federal statute and implementing regulations. (52 U.S.C. § 10503(e); 28 C.F.R. §§ 55.1, 55.6(c), 55.11, 55.12.) Rather, the Director of the Census and the Attorney General are charged with determining which jurisdictions are subject to the bilingual requirements of the Voting Rights Act, by determining whether voting-age citizens who "are members of a single language minority and are limited-English proficient" constitute five percent of the voting age citizens in the jurisdiction. (52 U.S.C. § 10503(b)(2)(A)(i)(I)–(III); 28 C.F.R. §§ 55.4(a) & (b), 55.6(a).) What is published in the Federal Register is, thus, as it states, a list of the "jurisdictions" (e.g., counties within a state) in which "members of a single language

29

minority" exceed the five percent threshold. Or stated another way, the single language minorities identified in the Federal Register (and in the appendix of the implementing regulations), by definition, meet the Voting Rights Act's five percent threshold.

Accordingly, by grounding his language assistance determinations on this federal list, the Secretary necessarily imports some vestige of the Voting Rights Act's five percent threshold into his determinations. The Legislature, however, expressly parted company with the federal Act in this regard and set a three percent, rather than five percent, threshold for "mandatory" language assistance under state law. (§ 14201, subd. (b)(1).) Accordingly, to this extent, the Secretary has not followed the clear directive of the statute.

In sum, while the Secretary has not erred or abused his discretion in referring to the Voting Rights Act's definitional language and the correlating regulatory provisions in construing the terminology "single language minority," he has erred as a matter of law in deeming the *coverage* determinations of the Director of the Census and the Attorney Generals as to the "specific language groups of the language minorities" covered by the federal Act and published in the Federal Register (and included as an appendix to the implementing federal regulations), as being the operative embodiment of that definition.

### 3. *Summary*

To ensure that our conclusions in this case are clear, we offer the following summation:

(1) In any precinct in a county **not** subject to the Voting Rights Act, the state law facsimile posting and availability requirements apply if there are three percent or more of voting age residents in the precinct who are part of a "language minority group" within the broader categories of "American Indian, Asian American, Alaskan Natives, or of Spanish heritage" and of limited English proficiency. Accordingly, if, for example, voting age residents of Korean or Filipino heritage with limited English proficiency equal or exceed three percent of the voting age residents in the precinct, the state law facsimile posting and availability requirements apply, and language assistance must be provided. In other words, the Secretary must make the state law equivalent of the coverage

30

determinations made by the Director of the Census and the Attorney General and published in the Federal Register.

(2) In any precinct in a county that **is** subject to the Voting Rights Act, the state posting and availability requirements do not apply as to any language minority group for which bilingual election materials must be provided under the federal Act. However, state posting and facsimile availability requirements will apply as to any other language minority group if three percent or more of voting age residents in the precinct are part of such a group within the broader categories of "American Indian, Asian American, Alaskan Natives, or of Spanish heritage" and are of limited English proficiency. Accordingly, if, for example, a county is required to provide election materials in Spanish under the Voting Rights Act, the state facsimile posting and availability requirements do not apply and therefore do not require any additional language assistance in Spanish. However, if a precinct within such county also has a three percent or greater population of voting age residents of Korean or Filipino heritage with limited English proficiency, the state law facsimile posting and availability requirements apply and language assistance must be provided for that language minority group. In other words, as to other "language minority groups," the Secretary must make the state law equivalent of the coverage determinations made by the Director of the Census and the Attorney General and published in the Federal Register.

## DISPOSITION

The judgment is affirmed in part and reversed in part, with directions to enter judgment in accordance with this opinion. Parties to bear their own costs on appeal.

                                                     _____

Banke, J.

We concur:

_____

Humes, P. J.

_____

Margulies, J.

A155392, *Asian American Advancing Justice v. Padilla*

Trial Court:   San Francisco City and County Superior Court

Trial Judge:   Hon. Richard B. Ulmer

Counsel:

Wilson, Sonsini, Goodrich & Rosati, Steven Mark Schatz, Deanna Kitamura, Nicole G. Ochi, Jonathan T. Stein, Winifred V. Kao, Raul Macias, William S. Freeman, David Joel Berger, Dylan Grace Savage, and Linda Lye for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Anthony P. O'Brien, Deputy Attorney General for Defendant and Respondent.